BOLIN, Justice.
The three appeals in this case involve issues of first impression regarding the Alabama Accountability Act (hereinafter “the AAA”), codified at § 16-6D-1 et seq., Ala.Code 1975.

Facts

The Alabama House of Representatives approved House Bill 84 (“HB 84”), a bill relating to education, and the bill, then known as the “Local Control School Flexibility Act of 2013,” was sent to the Senate, where the Education Committee gave it a favorable report. (A copy of HB 84 is attached to this opinion as appendix A.) At that time, HB 84 authorized the establishment of innovative schools and school systems by allowing the' State Board of Education (“the State BOE”) to enter into a “flexibility” contract with the school or school system that would allow for program flexibility and/or budgetary flexibility within the school or school system. The purpose of the flexibility contracts was to “advance the benefits of local school and school systems autonomy in innovation and creativity,” HB 84, Section 2(b), by exempting the schools from certain state laws, including State BOE rules, regulations, and policies, in exchange for academic and associated goals for students that improve academic outcomes and close a deficient achievement gap. HB 84 Would require a local school'to submit a proposed innovation plan that had been recommended by the local superintendent of education and approved by the local board of education to the State Superintendent of Education in order to qualify for “innovation” status. HB 84 authorized the State BOE to'promulgate any necessary rules' and regulations for implementation.
On February 28, 2013, during the third reading of HB 84 on the floor of the Senate, an amendment, which made minor changes, was proposed and approved, and HB 84 was passed by the Senate. The amended version of HB 84 was then sent to the House, but the House voted to “nonconcur,” and HB 84 was sent to a *90 conference committee of representatives and senators.
Notice was issued announcing that the conference committee would meet at 3:15 p.m. The meeting was called to order, but was immediately recessed to reconvene at 4:15 p.m. However, the meeting did not reconvene until 5:00 p.m., at which time a “substitute” version was distributed. The • substitute version was 21 pages longer than the original; the name had been changed to the “Alabama Accountability Act of 2013”; and multiple new provisions had been added, including two provisions allowing for tax-credit programs. (A copy of the substitute version of HB 84 is attached to this opinion as Appendix B.) Specifically, Section 8 of HB 84 provided for a tax credit for parents of students who are zoned for a “failing school” and who choose to send their children to a nonpublic school or a nonfailing public school. The tax credits were to be paid out of the Education Trust Fund (“the ETF”).[1] Section 9 provided for a tax credit that could be claimed by individuals or corporations who make contributions to “scholarship-granting organizations” for educational scholarships for students who would otherwise be attending a failing school so that the student could attend a nonpublic or nonfailing public school.
A majority of the conference committee voted in favor of the substitute version of HB 84. Subsequently, HB 84, as substituted, was sent to the House and the Senate for approval. The House and the Senate adopted the substitute version of HB 84 on February 28, 2013, the same day the substitute version was introduced. On March 14, 2013, the governor signed HB 84. On May 20, 2013, the legislature passed House Bill 658 (“HB 658”), which amended portions of the AAA. (A copy of HB 658 is attached to this opinion as Appendix C.) The amendments set out in HB 658 prohibited a public or nonpublic school from being required to enroll a particular student. The amendments also opened the scholarship program to low-income students, even if those students did not attend or were not zoned to attend a failing school. Although the amendments in HB 658 allowed low-income students in nonfailing schools to apply for scholarships, low-income. students in failing schools or zoned for failing schools were given priority for the scholarships.
On April 8, 2014, the legislature passed Act No. 2014-346, its annual recodification bill, which adopts and incorporates into the Code of Alabama 1975 those general and permanent laws of the State enacted during the 2013 Regular Session as contained in the 2013 Cumulative Supplement to certain volumes of the Code and additions or deletions made by the Code commissioner for editorial purposes. (A copy of Act No. 2014-346 is attached to this opinion as Appendix D.) The AAA is now set out in § 16-6D-1 et seq.

Procedural History

On August 26, 2013, Daniel Boyd, Anita Gibson, and Senator Quinton Ross, Jr. (hereinafter collectively referred to as “the *91 plaintiffs”),[2] sued Julie P. Magee, in her official capacity as the Commissioner of Revenue, and Thomas L. White, Jr., in his official capacity as Comptroller of the State of Alabama (hereinafter collectively referred to as “the State defendants”). The plaintiffs challenged the constitutionality of the AAA under certain provisions of the Alabama Constitution of 1901 as follows:
Count I alleged that the substitute version of HB 84, which added the tax-credit programs to pay for the education of Alabama schoolchildren in nonpublic schools, altered the original purpose of HB 84, in violation of Art. IV, § 61 (“[N]o bill shall be so altered or amended on its passage through either house as to change its original purpose.”);
Count II alleged that, because the original version of HB 84 differed substantially in form and substance from the substitute version of HB 84, the substitute version had not been read on three days in each house, in violation of Art. IV, § 63 (“Every bill shall be read on three different days in each house....”); Counts III-V alleged that the AAA contained two separate and distinct subjects in that Sections 5-7 authorized flexibility contracts with the State BOE and Sections 8 and 9 created a tax-credit program to pay for the education of Alabama schoolchildren in nonpublic schools, Section 8 repealed an earmark on funds dedicated to the ETF while also making a new appropriation of those funds to pay for tax credits, and Section 9 repealed an earmark on funds dedicated to the ETF while also making a new appropriation of those funds to pay for tax credits for donations to scholarship-granting organizations, all in violation of Art. IV, §§45 and 71 (§ 45 — “Each law shall contain but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes... ”; § 71 — all appropriations other than those contained in the general appropriation bill “shall be made by separate bills, each embracing but one subject.”);
Count VI alleged that the AAA appropriated funds from the ETF to finance tax-credit programs that reimburse tuition and fees to nonpublic schools not under the absolute control of the State, in violation of Art. IV, § 73 (“No appropriation shall be made to any charitable or educational institution not under the absolute control of the state, other than normal schools established by law for the professional training of teachers for the public schools of the state, except by a vote of two-thirds of all the members elected to each house.”);
Count VII alleged that Section 9 of the AAA provides a 100% tax credit to be ' funded by revenue that would otherwise be deposited in the ETF, in violation of Art. XI, § 211.02 (Off. Recomp.)(income taxes shall be earmarked for placement in the ETF and are “to be used for the payment of public school teachers’ salaries only”);
Count VIII alleged that the AAA created a new debt in that the AAA pledges funds from existing revenue streams to pay taxpayers in the form of refunds, rebates, or tax credits in violation of Art. XI, § 213 (“Any act creating or incurring any new debt against the state, except as herein provided for, shall be absolutely void.”);
*92 Count IX alleged that the AAA diverts money from the ETF that is raised for the support of public schools and appropriates and uses that money to support sectarian and denominational schools, in violation of Art. XIV, § 263 (“No money raised for the support of the public schools shall be appropriated to or used for the support of any sectarian or de- , nominational school.”); and
Count X alleged that the AAA diverts taxpayer funds to religious schools through tax credits that pay for some of or all the cost of attending such schools, which are places of worship and ministries of the churches or other religious organizations that own, operate, sponsor, or control them, in violation of Art. I, § 3 (“[N]o one shall be compelled by law to attend any place of worship; nor to pay any tithes, taxes, or other rate for building or repairing any place of worship, or for maintaining any minister or ministry.....”).
On October 9, 2013, the State defendants filed a motion to dismiss the case for failure to state a claim upon which relief could be granted, pursuant to Rule 12(b)(6), AJa. R. Civ. P. The State defendants asserted that the 10-count complaint fell into 2 broad categories: claims that the AAA is invalid based on alleged procedural deficiencies committed during its passage and claims that the law is improperly spending state money. They further argued that there were no procedural deficiencies in the passing of the AAA and that the AAA does not violate any restrictions on the use of public money. Specifically, the State defendants argued that the AAA did not violate the original-purpose requirement or the single-subject requirement because, they argued, the AAA contains two ways of enhancing flexibility in the area of education in that “both the school flexibility contracts and the school-choice tax credit programs give their beneficiaries flexibility from entrenched policies.” They argued that the AAA did not repeal an earmark on funds and reappro-priate thosé same funds in one act in contravention of Childree v. Hubbert, 524 So.2d 336, 341 (Ala.1988). This is because, they say, the tax-credit account established in Section 8 is within the ETF so that “every penny of sales-tax proceeds is still going into the Education Trust Fund” arid the tax-credit program established in Section 9, while -reducing the overall proceeds available to - public schools from the income-tax proceeds, does not redirect or un-earmark the income-tax revenues that do enter the public • coffers. • The State defendants argued that the three-reading requirement was met because the Constitution does not require, that a particular version of a bill-be. read. They argued that the amendments in HB 658 cured any procedural deficiencies in the AAA The State defendants argued that the AAA did not improperly spend public funds based bn Alabama Education Ass’n v. James, 373 So.2d 1076 (Ala.1979). They further argued that because the AAA provides funds directly to parents and not to the nonpublic schools, the funds are not being improperly used to support religious schools. Last, the State defendants argued that the AAA did not create a new public debt in violation of the anti-debt provision in the Alabama Constitution because the tax credits in Section 8 do not require deficit spending.
On October 21, 2013, the circuit court granted a motion to intervene filed by Tequila Rogers, Danyal Jones, and Mark Jones (hereinafter collectively referred to as “the tax-credit parents”). The tax-credit parents are parents of students who, at the beginning of the 2013-2014 school year, used the tax credits created by Section 8 of the AAA, as amended by HB 658, to remove their children from “failing” public *93 schools and enroll them in private schools. The tax-credit parents had argued that they were entitled to intervene as a matter of right under Rule 24(a)(2), Ala. R. Civ. P., because they had a significant interest in the operation of the AAA as direct beneficiaries of the AAA and that their interest may be greatly impaired by the disposition of the plaintiffs’ complaint. They also sought permissive intervention pursuant to Rule 24(b), Ala. R. Civ. P.
On November 21, 2013, the plaintiffs filed a motion for a judgment on the pleadings as to Counts I-VIII of their complaint. They argued that the AAA had been unconstitutionally adopted because of the significant alteration of its content through a substitute bill and that the AAA violated constitutional restrictions on the appropriation and use of public funds. The plaintiffs did not seek a judgment on the pleadings regarding Counts IX and X of their complaint asserting religion-clause issues because they asserted that factual development would be necessary with regard to the nature of the' schools that Alabama schoolchildren will attend at taxpayer expense under the AAA.
That same day, the tax-credit parents filed a motion for a judgment on the pleadings on all of the plaintiffs’ claims. The tax-credit parents incorporated the State defendants’ arguments and focused on the plaintiffs’ claims in Count IX and X of their complaint, which alleged that the AAA violates the manner in which public funds may flow to private religious schools. They argued that the tax-credit programs are religiously neutral student-assistance programs under which parents are free to choose religious and nonreligious schools. They further argued that the AAA does not use any funds that have been raised for the support of public schools because the scholarships are funded by voluntary private donations, not by public funds. The tax-credit parents argued that, although the payment of refundable tax credits does use public funds, those funds are paid to, and used for the support of, parents and students, not religious schools. On April 10, 2014, the State defendants filed a motion asserting'that Counts I through V of the plaintiffs’ complaint had been rendered moot because the legislature had reenacted the provisions of the AAA when' it incorporated them into the Alabama Code as part of its annual codification bill. They argued that the adoption of the 2014 cumulative supplement cured any infirmities of the legislative procedure in enacting the AAA.
On May 28, 2014, the circuit court entered an order in favor of the plaintiffs as to Counts I through VIII of their complaint. We summarize the holdings in the circuit court’s order as follows:
(1) The AAA,'which provides in Sections 5 through 7 for local'school-flexibility contracts, and in Sections 8 through 9 for tax credits to pay private-school tuition, contains two separate subjects, in violation of §§ 45 and 71. The circuit court concluded that the tax-credit programs have no relation to the flexibility-contract provisions, and those sections do not interact with each other. The circuit court determined that no attempt is made in the AAA to link' these provisions in any way, and, indeed, the only apparent relationship between1 them is the legislature’s use of the flexibility-contract bill as-a vehicle for enacting the tax-credit legislation. The circuit court also determined that the AAA violated § 45 in that Section 8 removed an earmark on sales-tax revenue deposited in the ETF and, instead, appropriated those funds to reimburse parents for the cost of enrolling their children in private schools. ;
(2) The passage of the AAA violated § 61 in that the introduction of the sub *94 stitute bill on February 28, 2013, transformed the local-school-system-autonomy bill to a bill providing tax credits to pay for children to leave public schools for private schools. The circuit court determined that the alterations in the substitute bill did not advance local-school-system autonomy or provide school systems with additional flexibility and, if anything, did the opposite by setting up a system under which certain schools deemed to be “failing” will lose students and resources. The circuit court also concluded that the substitute bill violated § 63 because the substitute bill, which included the tax-credit additions, was not read on three different days, but was instead passed by both the House and the Senate on a single afternoon. The circuit court stated that the violations of § 61 and § 63 were not “cured” by the subsequent passage of HB 658, which amended several provisions of the AAA, because the legislature was voting only on whether to approve those amendments and because deficiencies in the passage of legislation are not cured by a subsequent vote on amendments to that legislation based on State v. Martin, 160 Ala. 181, 48 So. 846 (1909).
(3) The AAA improperly appropriated public funds to a “charitable or educational institution not under the control of the state” as provided for in § 73 because the AAA contains an appropriation of public funds to pay for the refundable tax credits provided by Section 8 to parents in reimbursement of the cost of private-school tuition. The circuit court stated that it is not dispositive' that the funds appropriated by Section 8 reach the private schools indirectly rather than directly. The circuit court concluded that because the intent of the appropriation was to pay tuition for eligible students to attend private schools in that parents receive the tax refunds only in reimbursement of money they have spent for tuition, the legislature was doing indirectly what it is forbidden to do directly. The circuit court determined that because the Section 9 tax credit for donations to scholarship-granting organizations reimburses such donations in full, there is no private contribution, but simply a redirection of funds from the public fisc to scholarship-granting organizations.
(4) The AAA violated Art. XI, § 211.02, Ala. Const. 1901 (Off. Re-comp.), providing for income-tax revenue to be deposited in the ETF for the payment of teachers’ salaries, because Section 9 of the AAA uses funds that otherwise would have been deposited into the ETF — up to $25 million each year — for a purpose other than the payment of public-school teachers’ salaries. Instead, those funds go to pay for the education of certain schoolchildren in nonpublic schools.
In its order, the circuit court denied the State defendants’ motion to dismiss and the tax-credit parents’ motion for a judgment on the pleadings with regard to Counts I through VIII. The circuit court concluded that, as to Counts IX and X, which involve religion, their motions were moot. The circuit court enjoined enforcement of the AAA.
On May 29, 2014, the State defendants and the tax-credit parents filed a joint motion to stay the circuit court’s order enjoining the enforcement of the AAA. The plaintiffs opposed the joint motion to stay.
On May 30, 2014, Rachell Prince, Tyrone Whitehead, and Dalphine Wilson, parents of children who received scholarships from the scholarship program created by Section 9 of the AAA (hereinafter collectively referred to as “the scholarship parents”), filed a motion to intervene. In affidavits, the scholarship parents stated that their *95 children were enrolled in private schools in the fall of 2013 and received notice in January or February 2014 that their children would receive scholarships from a scholarship-granting organization under the AAA to pay tuition for the 2013-2014 school year. The plaintiffs opposed the scholarship parents’ motion to intervene on the ground that motions to intervene following the entry of a judgment are generally untimely and will not be granted except in extraordinary circumstances. The plaintiffs argued that the scholarship parents are represented by the same attorneys who represent the tax-credit parents and that the attorneys have defended the constitutionality of both Section 8 and Section 9 from the outset of the litigation. The ■plaintiffs noted that the scholarship parents’ interests are also being represented by the State defendants who are also defending the constitutionality of the AAA in its entirety.
On June 5, 2014, the State defendants filed a timely notice of appeal from the circuit court’s May 28, 2014, order. On June 9, 2014, the circuit court granted the joint motion to stay that part of its order enjoining the enforcement of the AAA. That same day, the circuit court denied the scholarship parents’ ■ motion to intervene. On June 11, 2014, the tax-credit parents filed a timely notice of appeal from the circuit court’s order of May 28, 2014. That same day the scholarship parents filed a notice of appeal from the circuit court’s order of June 9, 2014, denying their motion to intervene. On June 27, 2014, this Court consolidated the three appeals.

Preliminary Procedural Issues

I. Whether legislative developments occurring after the passage of the AAA have rendered the plaintiffs’ procedural claims set out in Counts I-V of their complaint moot?

The first issue we address is whether any of the plaintiffs’ procedural claims were rendered moot by actions of the legislature following the passage of the AAA. The plaintiffs asserted several claims that the AAA was unconstitutional based on procedural deficiencies in the passage of the AAA. Specifically, the plaintiffs asserted: Count I — the AAA violated the “original purpose” requirement of § 61 because a substitute version of HB 84 was proposed and adopted on February 28, 2013; Count II — the AAA violated the readings “on three different days” requirement set out in § 63 because the substitute version of HB 84 was read and passed on February 28, 2013; and Counts III-V — the AAA violated the “single subject” requirement set out in §§ 45 and 71 because the substitute version of HB 84 added to the flexibility contracts for local schools Sections 8 and 9 providing for tax credits to pay for private-school tuition. Subsequent to the passage of HB 84, the legislature amended the AAA by passing HB 658, and, later, the legislature adopted its annual cumulative supplement bill in Act No. 2014-346.

A. 'Whether the plaintiffs’ claims in Counts I and II of their complaint became moot when the legislature amended the AAAinHB 658?

HB 658 amended Sections 4, 5, 8, and 9 of the AAA. The text of HB 658 indicates that the legislature voted only on whether to amend certain sections of the AAA. A vote against HB 658 would not have been a vote to repeal the AAA but would have been a vote against amending the AAA. The State defendants argue that HB 658 amended Sections 8 and 9 and that the plaintiffs cannot now complain that the enactment of the substitute version of HB 84 violated the original-purpose and three-readings requirements of the Constitution by including Sections 8 and 9 in the substitute version.
*96 In State v. Martin, 160 Ala. 181, 48 So. 846 (1909), there was a challenge to an alderman’s right to office where the. original bill annexed one city to another. The relators challenged the constitutionality of the original bill. The alderman argued that an amendment to the original bill cured the- constitutional defect in the original bill. This Court held that the subsequent vote on the amendment did not cure the constitutional defect where the subsequent vote was on the amendment only and not on the entire bill as amended.
In Board of Revenue of Jefferson County v. Hewitt, 206 Ala. 405, 90 So. 781 (1922), Jefferson County had entered into construction contracts based on the belief that certain bonds could be sold to pay the contractors. However, the bonds could not be sold at less than their face value pursuant to the 1907 Code of Alabama. The legislature enacted a curative statute in 1920 (applicable only to Jefferson County based on its population) to provide for the sale of county bonds at less than their face value and for reimbursement of contractors who had advanced to the county the difference between the market value and the face value of the bonds. A taxpayer sued the Jefferson County Board.of Revenue arguing that the 1920 statute violated the Constitution, which .required a majority of elector's to authorize a bond issue, and that the 1920 statute changed the material conditions and authority given in an earlier election authorizing bonds in accordance with the 1907 Code. Although the Court in Hewitt stated that “subsequent legislative ratification is the equivalent of primary legislation,” the Court recognized that the extent and effect of retroactive or curative statutes may be validated only when the legislature “originally had authority to confer the powers or to authorize the act or transaction” and that the curative statute did not have the effect of validating an unconstitutional statute. 206 Ala. at 409, 90 So. at 785-86.
In Glass v. Prudential Insurance Co. of America, 246 Ala. 579, 22 So.2d 13 (1945), superseded by statute on other grounds as recognized by Mooney v. Weaver, 262 Ala. 392, 79 So.2d 3 (1955), the court again addressed the constitutionality of §§ 890 and 891 of the Code of Alabama of 1940. Those sections provided a remedy by way of a tax refund, but the Court had earlier concluded that they violated the constitutional prohibition against suing the State. A few. .yeai's later, the legislature amended §§ 890 and 891 seeking to cure the constitutional defect. It was then.argued that the amended acts violated the constitutional prohibition against reviving or amending an act by reference to its title only. - The Court held that the title to the 1943 act, which was “[t]o amend- Sections 890 and 891” was not defective even; though the sections sought to be amended had earlier been declared unconstitutional. The Court explained that the reference to §§ 890 and 891 in the title of the act was for identification only because the amending act was “complete in itself,” and “not dependent on the repealed act for any other purpose.” 246 Ala. at' 583, 22 So.2d at 16. The fact that §§ 890 and 891 had been repealed did not militate against their use for identification purposes. In short,’the amending act was a new act correcting the constitutional prohibition against suing the State, which had rendered the prior versions of §§ 890-891 unconstitutional. The Court’s statement that the amending act was complete in itself did not indicate that any amendments to a legislative act reenact the original act..
In the present case, we find State v. Martin to be controlling on- this issue. HB 658 amended only certain sections of the AAA and, in the passage of HB 658, only those amended sections were voted *97 on, as was the case in Martin. HB 658 was not a curative statute as was the case in Hewitt. HB 658 was amending an existing statute, unlike Glass, where the legislature was curing the constitutional defects in an earlier statute by creating a new statute that was “ ‘complete and definite, in full compliance with the requirements of the Constitution.’” 246 Ala. at 583, 22 So.2d at 16 (quoting Harris v. State, 228 Ala. 100, 105, 151 So. 858, 862 (1933)). The amendments in HB 658 do nothing to cure any of the alleged constitutional defects in the enactment of HB 84. Accordingly, we cannot say that the amendments to the AAA contained in HB 658, which essentially (1) clarified some of the terms, (2) prohibited the mandatory enrollment of a particular student, and (3) expanded the scholarship program to low-income students • not in failing schools, mooted the plaintiffs’ arguments regarding procedural defects in the enactment of the AAA as set out in Counts I and HI of their complaint.

B. Whether the plaintiffs’ procedural claims in Counts I-V became moot when the legislature enacted the annual cumulative supplement to the Alabama Code in Act No. 20U-34.6?

We now turn to whether the legislature’s adoption of its annual cumulative-supplement bill cured any alleged procedural defects occurring during the enactment of the AAA In Ex parte Coker, 575 So.2d 43 (Ala.1990), the Court explained why the adoption of a cumulative-supplement bill did not give the force of law to a bill that had been improperly enacted but that was included in the codification bill. The Court discussed the history of the adoption of the Code of Aabama 1975. The Court noted that the legislature authorized the appointment of a Code commissioner in 1969 to revise, digest, and codify all the statutes and that the legislature in 1976 appointed a special joint committee to study the Code manuscript. A1 the legislators were given a copy of the Code manuscript, and in 1977 the legislature adopted the Code manuscript prepared by the Code commissioner, as reviewed and revised by the legislature. The Court noted that a similar process was used when the legislature adopted the 1852, 1867, 1876, 1886, 1896, 1907, 1923, and 1940 Codes of Aabama. The Coker Court recognized that it was the process of adopting an entire Code after notice, study, and revision by the legislature of the Code commissioner’s manuscript, that the Court had in mind when it held that “ ‘[a]ll infirmities of legislative procedure in enacting an original act are cured when that act is incorporated into a code and the code adopted by the legislature.’” Ex parte Coker, 575 So.2d at 50 (quoting Fuller v. Associates Commercial Corp., 389 So.2d 506, 509 (Aa.1980)).
The Court in Coker went on to cite several cases that involved the cure of defectively enacted statutes by adoption of an entire Code where the Codes were “adopted by the process of appointment of a code commissioner, review by the legislature of the code as a systematic revision of existing law, and enactment by the legislature of the manuscript as a new code governing the subjects included therein.” 575 So.2d at 51. The Court then contrasted this systématic review of the Codes with the 1983 cumulative-supplement act at issue in Coker, which adopted and incorporated into the 1975 Code all general laws enacted during the 1979 and 1980 Sessions, the 1981 Regular Session, and the 1982 Regular Session of the legislature. The 1983 cumulative-supplement act also corrected several grammatical and typographical errors in both the 1975 Code and the recent enactments being incorporated into the 1975 Code. The Court noted that the legislature had, by acts equivalent *98 to the 1983 act, regularly adopted and incorporated into the 1975 Code successive cumulative supplements in 1978, 1979, 1980, 1981, 1982, 1984, 1985, 1986, 1987, 1988, and twice in 1989.
In Ex parte State Department of Revenue, 683 So.2d 980 (Ala.1996), the Court acknowledged its holding in Ex parte Coker that the process of adopting the entire Code repeals any portion of the original legislation and any prior codification not included in that adoption. “[T]he adoption of the entire Code supersedes the original enactments and any prior codification.” 683 So.2d at 982. The Court went on to state:
“After this Court decided Coker, the legislature refined the codification process and began the current practice of annually codifying legislation. Under this new procedure, the Code commissioner continually reviews the manuscript of the Code and directs the Code publisher to publish replacement volumes and an annual supplement that incorporates into the Code the most recent acts of a general and permanent nature. Once the annual supplement and the replacement volumes are published, they are reviewed by the Code commissioner, who prepares an annual codification bill to adopt the replacement volumes and annual supplement. This Court, however, has not considered the question whether this process has the same effect as a codification of the entire Code for the purpose of resolving conflicts between the Code and the original act. In other words, we have not determined if these cumulative supplements also supersede the original enactment. Nevertheless, because we find that the 1993 supplement is not applicable here, we need not address this issue now.”
683 So.2d at 982.
In Swift v. Gregory, 786 So.2d 1097 (Ala.2000), the issue was whether the act as modified by the Code commissioner took precedence over the original bill passed by the legislature when the two versions differed. The Code commissioner moved a sentence out of a paragraph and placed it in its own paragraph. The Court, quoting State v. Towery, 143 Ada. 48, 49, 39 So. 309, 309 (1905), stated:
“Tt is the settled law of this state that the Code of Alabama ... is not a mere compilation of the laws previously existing, but is a body of laws, duly enacted, so that laws, which previously enacted, ceased to be law when omitted from [the] Code, and additions, which appear therein, become the law from the approval of the Act adopting the Code.’ ”
Swift, 786 So.2d at 1100.
We note that the complete quote from Towery, which was shortened in Swift, is as follows:
“It is the settled law of this State that the Code of Alabama, adopted as was the present Code of 1896, is not a mere compilation of the laws previously existing, but is a body of laws duly enacted, so that laws which previously existed ceased to be law when omitted from said Code, and additions which appear therein become the law from the approval of the Act adopting the Code.”
143 Ala. at 49, 39 So. at 309. The Court in Towery referred to the formal process of reenacting the entire Alabama Code as then set out in Article IV, § 46, of the 1875 Constitution. The Court explained the process by which an entire Code is adopted, noting that “the whole matter was referred to a committee, which carefully examined the proposed Code, comparing section by section, with the amendments and additions suggested, and reported on the same and the Act was passed according to the requirements of *99 the Constitution.” 143 Ala. at 49, 39 So. at 309.
In Densmore v. Jefferson County, 813 So.2d 844 (Ala.2001), the Court first concluded that the Storm Water Act was a general law rather than a local law within the meaning of the constitutional requirement that notice of the intent to apply a local law be published in the affected counties as set out in Art. IV, § 106. Although not necessary to its holding that the Storm Water Act was constitutionally enacted, the Court went on to discuss whether the 1995 adoption of the annual cumulative-supplement bill to the 1975 Code would have cured any alleged procedural defects in its enactment because this was the basis of the trial court’s holding. The Court in Densmore concluded that Ex parte Coker was not controlling, because “the annual codification process was begun after this Court had decided Coker” as noted in Ex parte Department of Revenue. 813 So.2d at 851. The Densmore Court went on to hold that, assuming arguendo that the Storm Water Act was a local act, any infirmities in the' adoption of the act were cured by the adoption "of the annual cumulative-supplement bill.
In the present case, we find Ex parte Coker to be controlling on the issue whether the adoption of the 2014 cumulative-supplement bill in Act No. 2014-346 cured any alleged enactment-related constitutional deficiencies in the AAA. The Coker Court explained why procedural infirmities in enacting a particular act are cured by the adoption of Code as a systematic revision of existing law but are not cured by the adoption of the annual cumulative-supplement bill. The United States Bankruptcy Court for the Northern District of Alabama also explained in In re Jefferson County, 469 B.R. 92, 105 (Bankr.N.D.Ala. 2012), the collaborative process that is employed when a Code is enacted:
“For the compilation of the Code of Alabama 1975, The Michie Company and the Bobbs-Merrill Company were collectively the Code Commissioner and collaborated with the Alabama Legislature through the Joint Legislative Subcommittee on Code Revision of the Alabama Senate and the House of Representatives (the Joint Committee). As part of this process, The Michie Company and Bobbs-Merrill Company solicited the views of the Alabama State Bar, the Legislative Reference Service, other groups and associations, and attorneys throughout Alabama. The Joint Committee and the Code Commissioner communicated via a series of memoranda dedicated to each title of the draft compilation of the 1975 Code. These communications include the recommendation by the Code Commissioner to the Joint Committee and its responses, which sometimes include agreeing with what the Code Commissioner proposed and other times disagreeing and providing edited or alternative language.”
No such review or collaboration occurred-in the passage of Act No. 2014-346. Instead, the adoption of the cumulative supplement in Act No. 2014-346 was part of the Code commissioner’s[3] duties to incorporate into the 1975 Code all the recent enactments of the legislature and to prepare a bill to adopt those changes to the Code. § 29-7-6(6), Ala.Code 1975. The Code commissioner performs editorial functions such as changing the wording of descriptive headings and catchlines; changing and substituting hierarchy units; changing and correcting reference num *100 bers (so long as such a correction can be made without altering the substance of a law); removing language in the Code that is deemed surplusage; substituting hierarchical designations; changing words when directed by law; dividing, ■ consolidating, and rearranging hierarchy units and parts of - them; resolving nonsubstantive conflicts between multiple acts; changing capitalization, spelling, and punctuation; and correcting grammatical, clerical; and 'typographical errors by adding or deleting language or by other methods. § 29-7-8(a)(l)-(14), Ala.Code 1975. The Code commissioner also determines the appropriate location in the Code to place recent enactments. However, those editorial functions “may not alter the sense, meaning, or effect of any act.” § 29-7-8(a).
To conclude that the adoption of the annual cumulative-supplement bill cures any enactment-related deficiencies would be to ignore the procedural requirements set forth in the Alabama Constitution, which serve to protect the integrity of the legislative process. Cf. State v. Buckley, 54 Ala. 599, 612 (1875) (explaining that the “main controlling aim and purpose” of constitutional provisions such as the original-purpose requirement, three-readings requirement, and single-subject requirement is to “prevent ‘hodge-podge’ and injurious combinations, by confining each law to 'one subject” and to “prevent hasty and inconsiderate legislation, surprise and fraud”). It would also effect a nullification of numerous cases addressing those constitutional procedural requirements for enacting legislation. It is the thoughtful, systematic, and collaborative review of the entire Code through a Code manuscript along with revisions by the legislature when adopting an entire new Code that validate any procedural infirmities in the enactment of original legislation.
We recognize that the Court in Dens-more held that any procedural infirmities, in the Storm Water Act were ■ cured through the legislature’s enactment of the annual cumulative-supplement bill in 1996. The Densmore Court found that Ex parte Coker was not controlling, in part because “the annual codification process was begun after this Court decided Coker,” as noted in Ex parte State Department of Revenue. 813 So.2d at 851. In Ex parte State Department of Revenue, the Court did note that the process had been “refined” since this Court’s opinion in Ex parte Coker. 683 So.2d at 982; Indeed, we note that subsequent to our decision in Ex parte Coker, the legislature, in 1993, did statutorily create a permanent Code commission^ er. Act No. 1993-618, amending § 29-7-1 et seq., Ala.Code 1975. Before then, the Code commissioner was sometimes the publisher of the Code, sometimes an individual appointed by the governor or the legislature, or sometimes a Code commission or Code committee. In 1996, the legislature adopted § 29-7-8, addressing the Code commissioner’s compilation of the. Code and specified editorial functions and exempting the adoption of the annual cumulative-supplement bill from the single-subject requirement of § 45. However, the adoption of the cumulative-supplement bills enacted after 1993 occurred nearly annually and accomplished essentially the same tasks as today, i.e., adopting and incorporating recent enactments from the previous year or legislative sessions into the 1975 Code, along with making typographical and grammatical changes. Cf. .Act No. 1978-674; Act No. 1979-37;' Act No. 1980-753; Act No. 1981-653; Act No. 1982-567; Act No. 1983-131; Act' No. 1984-259; Act No. 1985-45; Act No. 1986-375; Act No. 1987-805; Act No. 1988-918; Act No. 1989-525; Act No. 1989-99.0; Act No. • 1991-553; Act No. 1993-614; Act No. 1994-305; Act No. *101 1995-255; Act No. 1996-261; • Act No. 1997-216; Act No. 1998-279; Act No. 1999-203; Act No. 2001-344; Act No. 2002-403; Act No. 2004-484; Act No. 2006-291; Act No. 2007-147; Act No. 2009-149; Act No. 2010-598; Act No. 2011-236; Act No. 2012-363; and Act No. 2014-346. In concluding -that Ex parte Coker was not controlling, the Court in Densmore placed too much emphasis on a distinction in the “refined” procedure adopted after Ex parte Coker was issued.
The Densmore Court also concluded that Ex parte Coker was not controlling because Coker involved a pocket veto of legislation that never became law.[4] However, the substance of Coker was that the bill did not later become law simply because it'was incorporated into the Code by the adoption of the annual cumulative-supplement bill. Whether a bill has constitutional defects in the manner in which it was passed or an event denied a bill’s status as law, neither should be implicitly validated by a later adoption of the annual cumulative-supplement bill. In concluding that Ex parte Coker was not controlling, the Court in Densmore placed too much emphasis on distinguishable facts.
To the extent that the judicial dicta in Densmore can be relied upon and conflicts with this opinion, we overrule it.[5] The adoption of the annual cumulative-supplement bill did not cure any procedural defects in. the enactment of the AAA. “[Cjodification of an invalid statute cannot cure a constitutional defect.” Densmore, 813 So.2d at 859 (Moore, C.J., dissenting).
II. Whether the plaintiffs’ claims in Counts I-III of their complaint present nonjusticiable political questions?
We now turn to whether the plaintiffs’ procedural claims set -out in Counts I-III of their complaint regarding the original-purpose requirement of § 61, the three-reading requirement of § 63, and the single-subject requirement of § 45, involve a political question such that those constitutional requirements are reserved for the legislature to determine. The State defendants argue that the three-readings requirement speaks in terms of “bill[s];” which highlights its relationship to matters of “internal. voting proceedings,” which is within the domain of the legislature as discussed by the Court in Birmingham-Jefferson Civic Center Authority v. City of Birmingham, 912 So.2d 204 (Ala.2005)(hereinafter ' “BJCCA ”). They contend that the original-purpose requirement also speaks in terms of “bill[s]” and therefore endows the legislature, with primary enforcement responsibility. The State defendants argue that the single-subject requirement will lure the Court into making improper policy judgments.[6] We note that “‘[t]he “political question” *102 doctrine is grounded primarily in the separation of powers.’” McInnish v. Riley, 925 So.2d 174, 187 (Ala.2005) (quoting Fletcher v. Kentucky, 168 S.W.3d 852, 860 (Ky.2005)).
In BJCCA, we declined to consider a “nonjusticiable political question” involving the voting procedures of the legislature. This Court referred to the United States Supreme Court’s formulation of what constitutes a nonjusticiable political question, being mindful that there are differences between the United States Constitution and the Alabama Constitution in that the separation-of-powers doctrine is explicit in the Alabama Constitution and implied in the United States Constitution:
“ Tt is apparent that several formulations which vary slightly according to the settings in which the questions arise may describe a political question, although each has one or more elements which identify it as essentially a function of the separation of powers. Prominent on the surface of any case held to involve a political question is found [1] a textually demonstrable constitutional commitment of the issue to a coordinate political department; or [2] a lack of judicially discoverable and manageable standards for resolving it; or [3] the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or [4] the impossibility of a court’s undertaking independent resolution without expressing lack of the respect due coordinate branches of government; or [5] an unusual need for unquestioning adherence to a political decision already made; or [6] the potentiality of embarrassment from multifarious pronouncements by various departments on one question.’ ”
BJCCA, 912 So.2d at 214-15 (quoting Baker v. Carr, 369 U.S. 186, 217, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962)).
In BJCCA, the City of Birmingham and Jefferson County sought a judgment declaring that certain taxation statutes were invalid because they were not passed by a majority of a proper quorum of the House of Representatives, as required by § 63 of the Alabama Constitution. 912 So.2d at 206-07. The issue before the trial court was whether “a bill must receive the affirmative vote of a majority of a quorum, or ... only the affirmative vote of a majority of the yea and nay votes cast in the presence of a quorum.” 912 So.2d at 209. The trial court found that the Constitution required the former — the affirmative votes of a majority of a quorum — but that only the latter had actually occurred, rendering the acts unconstitutional. On appeal, this Court held that the case presented a non-justiciable political question and that the trial court should have declined to decide the question. 912 So.2d at 205. The Court explained that there was evidence in the form of affidavits that, for at least 30 years, the legislature had interpreted § 63 to mean that when a quorum is present and a bill receives a favorable majority of those votes for and against it, then that bill has passed that house of the legislature. The Court noted that, as a matter of local legislative courtesy, members of the legislature had the practice of abstaining from voting on a bill of purely local application unless the bill is applicable to that legislator’s county. Although the members of the legislature did not always follow this practice, both the House and the Senate had rules in place contemplating that fewer than a quorum present may vote on a bill. In short, the legislature’s interpretation of § 63 was reflected in its rules and practices. The Court, following the principles in Baker v. Carr, concluded:
“Section 53, Ala. Const.1901, specifically commits to each house of the legislature the ‘power to determine the rules *103 of its own proceedings.’ Our Constitution contains no identifiable textual limitation on the legislature’s authority with respect to voting procedures that would permit judicial review of ‘those procedures. There is also a lack of judicially discoverable and manageable standards ■ for resolving whether the House of Representatives constitutionally passed Act No. 288 and Act No. 357. Finally, for the judicial branch to declare the legislature’s procedure for determining that a bill has passed would be to express a lack of the respect due that coordinate branch of government. For each of these three reasons, this case presents a nonjusticiable political question.”
912 So.2d at 221.
BJCCA was not the first time this Court had addressed the interplay between the separation of powers and judicial review of legislative action. In Rice v. English, 835 So.2d 157 (Ala.2002), there was a constitutional challenge to the Senate’s redistricting plan. In addressing the defendants’ argument that the Court should decline to address the challenge based on the separation-of-powers doctrine, the Court stated:
“Such abdication of judicial responsibility is inconsistent with the settled principle that the people have forbidden the Legislature from conducting itself in a manner inconsistent with their constitution and when it does, it is incumbent upon the judiciary to nullify a legislative enactment contrary to the constitution'. See Ex parte Selma & Gulf R.R., 45 Ala. 696 (1871).”
835 So.2d at 162. The Court went on to acknowledge the principle in Selma & Gulf R.R., 45 Ala. 696 (1871), that although the Court has the power to exercise judicial review of acts of the legislature, the Court should be mindful of the need for restraint.
“ ‘No power of this grave nature [i.e., judicial review of legislative acts] is expressly given. Considering its importance, it is a little strange that it has been wholly omitted. But, grant that it exists. It can not be permitted to rest upon mere inference and argument; because, if the inference is a mistake, or the argument is false, its exercise is an usurpation by one branch of the government against the authority of another. Did the people mean to grant such a power, unless some express clause of the constitution was clearly disregarded? I think not.’ ” ■
835 So.2d at 162 (quoting Selma & Gulf R.R., 45 Ala. at 728).
Subsequent to BJCCA, the Court addressed whether the Constitution was violated by the legislature’s authorization of a permanent joint legislative committee to disburse appropriations from the education budget through awards of community-services grants. The Court concluded that the case was not concerned with internal legislative matters of parliamentary procedure, but "with a question concerning the fundamental power of the legislature to enact a law of statewide application. The political-question doctrine was no bar, therefore, to judicial resolution of the issue presented.
“[I]f he question is not.one of discretion but of power, the separation-of-powers doctrine is no bar to judicial review. In other words, where the issue is whether ‘ “the [legislative branch has] exceeded the limits of [its] authority, thereby acting unlawfully, the courts will not hesitate to say so.” ’ PACE, Suburban Bus Div. of Reg’l Transp. Auth. v. Regional Transp. Auth., 346 Ill.App.3d 125, 136, 803 N.E.2d 13, 23, 280 Ill.Dec. 783, 793 (2003) ... (quoting West Side Org. Health Servs. Corp. v. Thompson, 73 Ill.App.3d 179, 187, 391 N.E.2d 392, 399, 29 Ill.Dec. 129, 136 (1979), rev’d on other *104 grounds, 79 Ill.2d 503, 404 N.E.2d 208, 38 Ill.Dec. 784 (1980)).”
McInnish, 925 So.2d at 187 (emphasis omitted).
In Jefferson County v. Weissmah, 69 So.3d 827 (Ala.2011), the issue involved whether published notice of legislation regarding the reenactment of Jefferson County’s occupation tax complied with § 106 of the Alabama Constitution, which requires notice by publication to those affected by the local legislation. The Court noted that the purpose of the notice requirements of § 106 is the prevention of deception and surprise so that those affected may have a fair opportunity to protest or otherwise to express their views. The Court held that it could review the adequacy of the notice given for the local act. The Court noted that numerous cases from the Court had assessed the adequacy of notice under the constraints of § 106 to determine the constitutionality of the challenged legislation. The Court concluded that it was the' special province of the courts to determine whether the notice requirements complied with the Constitution, and the Court declined to retreat from its history of judicial review on the subject.
In order to determine the existence and extent of any “textual commitment” to the legislature in this case as set out in the first factor in Baker v. Carr, it is necessary to turn to the constitutional provisions governing the exercise of the power in question. It is without question that the text of the Alabama Constitution commits to the legislature the legislative power of this State. Art. IV, § 44 (“The legislative power of this state shall be vested in a legislature, which shall consist of a senate and a house of representatives.”). The text of the Alabama- Constitution also gives each house the power to enact rules governing its proceedings. Art. IV, § 53 (“Each house shall have power to determine the rules of its proceedings and to punish its members and other persons, for contempt or disorderly behavior in its presence; to enforce obedience to its processes; to protect its members against violence, or offers of bribes or corrupt solicitation; and with the concurrence of two-thirds of the house, to expel a member, but not a second time for the same offense; and the two houses shall have all the powers necessary for the legislature, of a free state”).
Although not referring to- a single internal rule or to the legislature’s choice or policy of complying with its internal rules or procedures, the-State defendants essentially argue that the Constitution grants the legislature power to set its own internal procedures, including the procedures by which it determines its own compliance with constitutional procedural limitations, and because, they say, the plaintiffs are making a policy-based challenge of whether the AAA met the original-purpose, three-readings, or single-subject requirements, allowing the legislature final authority to decide its compliance with those constitutional requirements will in no way deprive another constitutional provision of its field of operation. We note that the present case is easily distinguishable from BJCCA.' BJCCA involved an internal rule promulgated by the House of Representatives, along with evidence of at least 30 years of local legislative courtesy regarding the legislature’s internal voting procedures. It is also distinguishable from Ex parte Marsh, 145 So.3d 744 (Ala.2013). In Marsh, this Court addressed a mandamus petition arising out of allegations that the AAA was passed in violation of the Open Meetings Act and an internal legislative rule regarding additions to bills going to a conference committee.
The factors set out in Baker v. Carr must be interpreted in light of the purpose of the political-question doctrine:
*105 “The political question doctrine excludes from judicial review those controversies ■ which revolve around policy.choices and value determinations constitutionally committed for resolution to the halls of Congress or the confines of the Executive Branch. The Judiciary is particularly ill suited to make such decisions; as ‘courts are fundamentally under-equipped to formulate [state] policies or develop standards for matters not legal in nature.’ ”
Japan Whaling Ass’n v. American Cetacean Soc’y, 478 U.S. 221, 230, 106 S.Ct. 2860, 92 L.Ed.2d, 166 (1986) (emphasis added). Nevertheless, the exercise of the judiciary’s power to interpret the Constitution and to review the constitutionality of the acts of the legislature does not offend these principles. Marbury v. Madison, 5 U.S. (1 Cranch) 137, 177-78, 2 L.Ed. 60 (1803). The legislature’s exclusive power over its internal rules does not give the legislature the right to usurp the function of the judiciary as ultimate interpreter of the Alabama Constitution. In carrying out this function, we do not violate the separation-of-powers doctrine upon which the political-question doctrine is based when we determine whether a legislative enactment was constitutionally adopted. Therefore, the first factor in Baker v. Carr does not preclude our review of the plaintiffs’ challenges.
Neither does this Court lack “judicially manageable standards” under the second factor in Baker v. Carr to evaluate the plaintiffs’ constitutional challenges. In United States v. Munoz-Flores, 495 U.S. 385, 110 S.Ct. 1964, 109 L.Ed.2d 384 (1990), the issue was whether 18 U.S.C. § 3013, which required courts to impose a monetary “special assessment” on any person convicted of a federal misdemeanor, was passed in violation of the Origination Clause of the United States Constitution. The Origination Clause mandates that “[a]ll Bills for raising Revenue shall originate in the House of Representatives.” U.S. Const., Art. I, § 7, cl. 1. In rejecting the argument that -the case involved a political question, the Supreme Court stated:
“The Government also suggests that a second Bakdr factor justifies our finding that this case is nonjusticiable: The Court could not fashion ‘judicially manageable standards’ for determining either whether a bill is ‘for raising Revenue’ or where a bill ‘originates.’ We do not agree. The Government concedes, as it must, that the ‘general nature of the inquiry, which involves the analysis of statutes and legislative materials, is one that is familiar to the courts and often central to the judicial function.’ Brief for United States 9. To-be sure, the courts- must develop standards for making the revenue and origination determinations, but the Government suggests no. reason that developing such standards will be more difficult in this cbntext than in any other. Surely a judicial system capable of determining when punishment is ‘cruel and unusual,’ when bail is ‘[ejxcessive,’ when searches are ‘unreasonable,’ and when congressional action is ‘necessary and proper’ for executing an enumerated power is capable of making the more prosaic judgments demanded by adjudication of Origination Clause challenges.”
Munoz-Flores, 495 U.S. at 395-96. There exists no lack of judicially manageable standards where the underlying determination to be made is legal in nature and requires this Court to apply normal principles of interpretation to the constitutional provisions at issue.
The plaintiffs are alleging that the legislature violated mandatory provisions of the Alabama Constitution. Simply because the plaintiffs and the State defen *106 dants disagree on whether the legislature’s actions met the procedural requirements of enactment does not require “an initial policy determination of a kind clearly for nonjudicial discretion.” Baker v. Carr, 369 U.S. at 217. A political question exists under the third factor of Baker v. Carr when, “to resolve the dispute, the court must make a policy judgment of a legislative nature, rather than resolving the dispute through legal and factual analysis.” EEOC v. Peabody W. Coal Co., 400 F.3d 774, 784 (9th Cir.2005). This Court need not make a legislative policy determination in order to resolve the constitutional challenges. Answering these questions does not infringe upon the legislature’s exclusive constitutional authority to adopt and enforce its own rules of procedure.
The plaintiffs’ complaint requires an interpretation of the Constitution, and we decline to forgo our responsibility to ensure that the legislature functions within the bounds of the Constitution under the pretext of deference to a coequal branch of government as set out in the fourth factor in Baker v. Carr. Invalidating a law for violating the original-purpose, three-readings, or single-subject requirements of the Alabama Constitution would not evince a lack of respect for the legislature within the meaning of Baker v. Carr. The authority to determine adherence to the Constitution is with the judiciary, and, if the legislature has not discharged its constitutional duty, then it is the judiciary’s duty to say so.
The State defendants do not suggest that answering the plaintiffs’ constitutional challenges presents an “unusual need for unquestioning adherence to a political decision already made.” Nor do they suggest that there is any more danger of “multifarious pronouncements” in this context than in any other in which this Court determines the constitutionality of legislation. Baker v. Carr, 369 U.S. at 217. Accordingly, the plaintiffs’ procedural challenges to the AAA, set out in Counts I — III are justiciable.

Constitutionality of the AAA

We now turn' to whether the circuit court erred in granting the plaintiffs’ motion for a judgment on the pleadings regarding the constitutionality of the AAA in Counts I-VIII of their complaint.[7]

Standard of Review

A circuit court’s grant of a Rule 12(c), Ala. R. Civ. P., motion for a judgment on the pleadings is subject to de novo review. Universal Underwriters Ins. Co. v. Thompson, 776 So.2d 81 (Ala.2000). “A court reviewing a judgment on the pleadings accepts the facts stated in the complaint as true and views them in the light most favorable to the nonmoving party.” Universal Underwriters, 776 So.2d at 82.
This Court’s review of constitutional challenges to legislative enactments is de novo. Richards v. Izzi, 819 So.2d 25, 29 n. 3 (Ala.2001). In McInnish v. Riley, 925 So.2d at 178, this Court further stated:
“[T]he standard of review of the trial court’s judgment as to the constitutionality of legislation is well established. This Court ‘ “should be very' reluctant to hold any act unconstitutional.” ’ ... ‘[I]n passing upon the constitutionality of a legislative act, the courts uniformly ap *107 proach the question with every presumption and intendment in favor of its validity, and seek to sustain rather than strike down the enactment of a coordinate branch of the government.’ Alabama State Fed’n of Labor v. McAdory, 246 Ala. 1, 9, 18 So.2d 810, 815 (1944). This is so, because ‘it is the recognized duty ■ of the court to sustain the act unless it is clear beyond a reasonable doubt that it is violative of the fundamental law.’ 246 Ala. at 9, 18 So.2d at 815.”
(Emphasis omitted.)
“ ‘ “It is the duty of the court to construe a statute so as to make it harmonize with the constitution if this can be done without doing violence to the terms of the statute and the ordinary canons of construction.” ’ ” Ex parte Jenkins, 723 So.2d 649, 658 (Ala.1998) (quoting Board of Educ. of Choctaw Cnty. v. Kennedy, 256 Ala. 478, 482, 55 So.2d 511, 514 (1951), quoting in turn Almon v. Morgan Cnty., 245 Ala. 241, 246, 16 So.2d 511, 516 (1944)).
“Where the validity of a statute is assailed and there are two possible interpretations, by one of which the statute would be unconstitutional and by the other would be valid, the courts should adopt the construction which would uphold it.... Or, as otherwise stated, it is the duty of the courts to adopt the construction of a statute to bring it into harmony with the constitution, if its language will permit.”
Alabama State Fed’n of Labor v. McAdory, 246 Ala. 1, 10, 18 So.2d 810, 815 (1944). “1 “We will not invalidate a statute on constitutional grounds if by reasonable consti'uction it can be given a field of operation within constitutionally imposed limitations.” ’ ” Lunsford v. Jefferson Cnty., 973 So.2d 327, 330 (Ala.2007) (quoting Town of Vance v. City of Tuscaloosa, 661 So.2d 739, 742-43 (Ala.1995) (other citation omitted)).

Discussion

III. Whether the AAA was enacted in violation of Art. IV, § 61, of the Alabama Constitution?

The plaintiffs challenge the constitutionality of the AAA, arguing that the substitute version of HB 84, which added the tax-credit programs to pay for the education of Alabama schoolchildren in nonpublic schools, altered the original purpose of HB 84 in violation of Article IV, § 61. Section 61 provides that “[n]o law shall be passed except by bill, and no bill shall be so altered or amended on its passage through either House as to change its original purpose.” The “purpose” of a bill as contemplated in § 61 of the Constitution “is the general purpose of the bill and not the mere details through which and by which that purpose is manifested and effectuated.” State Docks Comm’n v. State, 227 Ala. 521, 533, 150 So. 537, 547 (1933).
In Blackwell v. State, 230 Ala. 139, 162 So. 310 (1935), the issue was whether the purpose of a bill was so changed during the legislative process as to violate § 61. The Court held that it was not. The original bill relating to gambling provided as follows:
“An Act to prohibit the operation of slot machines and phnchboards.
“Be it enacted by the Legislature of Alabama:
“Section 1. That the operation of all slot machines, other than those that automatically give value for value, and the operation of all punchboards are hereby prohibited.
“Sec. 2. Any person violating this Act shall.be guilty of a misdemeanor.”
230 Ala. at 140, 162 So. at 311.
The final bill that was adopted provided as follows:
*108 “Section 1. DEFINITIONS. — That the term gambling device shall include and be deemed to embrace the following: (a) Any machine, mechanical device, contrivance, appliance or invention, whatever its name or character, in the use of which a consideration is paid or deposited, and there is gambling or the hazarding of small amounts of money or property to win larger amounts of money or property, (b) Any machine, mechanical device, contrivance, appliance or invention, whatever its name or character, which determines the result of winning or losing money or property by chance, lot or luck, in which neither the will nor skill of man can operate to influence the result of winning or losing, (c) Amy machine, mechanical device, contrivance, appliance- or invention, whatever its name or character, for. the division of or distribution of either money or articles of personal property, where said distribution or division is to be determined by lot or chance amongst those who take shares or are interested in the scheme, (d) Any machine, mechanical device, contrivance, appliance or invention, whatever its name or character, which is pper-ated or can be operated as a game of chance, (e) Any machine, mechanical device, contrivance, appliance or invention, whatever its name or character, where money or property is hazarded on chance, or risked qri an uncertain event, (f) Any machine, mechanical device, contrivance, appliance or invention, whatever its name or character, into which money is placed or deposited upon chance or upon the result of the action of such machine, mechanical device, contrivance, appliance of invention, (g) Any machine, mechanical device, contrivance, appliance or invention, whatever its name or character, which dispenses to the player or operator of the same any package of merchandise and also gives the player or operator the chance of placing himself in a position where his next succeeding play will assure him of a return of several times the value of the coin placed therein by him. (h) Any machine, mechanical device, contrivance, appliance- or invention, whatever its name or character, intended for the purpose of winning money or any -other thing by chance or hazard, (i) Any machine, mechanical device, contrivance, appliance or invention used or intended to be used as a substitute for, or in place of, any machine, mechanical device, contrivance, appliance or invention described .and enumerated in paragraphs (a), (b), (c), (d), (e), (f), (g), and (h) of this Act.
“Section 2. MACHINES OR DEVICES NOT REGARDED AS UNLAWFUL. — The provisions of this Act shall not apply to any machine, mechanical device, contrivance, appliance or invention by which merchandise is dispensed in a uniform quantity to each purchaser, although the price may be deposited in a slot in such machine, mechanical device, contrivance, appliance or invention, provided such machine or device can not be played for money, property, checks, credits, or any other representative or token of value. Nor shall the provisions of this Act apply to machines or devices where the element of chance is wholly absent, as 'where the machine or device indicates with absolute ceitainty, before the player deposits his coin or check, what he will receive from the machine, mechanical device, contrivance, appliance or invention. ■
“Section- 3. UNLAWFUL TO POSSESS, KEEP, OWN; SET UP, OPERATE OR CONDUCT GAMBLING DEVICES. — That it shall be unlawful for any person, firm, corporation or association of persons, within this State, to *109 possess, keep, own, set up, operate, or conduct, or permit to be set up, operated, or conducted, any gambling device prescribed in Section 1 of this Act, at any place whatsoever.
“Section 4. PUNISHMENTS FOR VIOLATING ACT. — Any violation of the provisions of this Act shall be a misdemeanor punishable by a fine of not more .than five hundred dollars, to which, at the discretion of the court or judge trying the case, may be added imprisonment in the county jail, or confinement at hard labor for the county, for not more than six months.
“Section 5. DUTY OF SHERIFF TO SEIZE AND REMOVE. — It shall be the duty of the sheriff of any county in which any gambling device may be found to seize the same, remove it from the place where it is found, and keep until disposed of as hereinafter provided in this Act. Within five days after the seizure and removal of any gambling device, the sheriff making the same shall report the seizure and detention to the circuit or other solicitor, or deputy solicitor, or any prosecuting officer within the county where the gambling device was found or seized, giving a full description thereof, the number of the device, if any, the place and firm of manufacture, the person in whose possession it was found, the person making claim to the same, or any interest therein, if the name can be ascertained or is known, and the date of the seizure.
“Section 6. DUTY OF SOLICITOR TO FILE BILL FOR FORFEITURE AND CONDEMNATION. — Upon the receipt of the report from the sheriff mentioned in Section 5 of this Act it shall be the duty of the circuit or other solicitor or'deputy solicitor, or any prosecuting officer within the county wherein the gambling device was found or seized, to forthwith file a bill in equity in the circuit court of the proper county, praying that such seized device be declared a gambling device, be' forfeited with its contents to the State, and be destroyed. Any person, firm, corporation or association of persons in whose possession said device may be found, or who shall claim to own the same, or any interest therein,' shall be made a party defendant to said bill,' and thereupon such matter shall proceed and be determined in equity in the circuit court of the proper county in the same form and manner, as near as may be, as in cases for the forfeiture and destruction of contraband liquors; conveyances and vehicles transporting prohibited liquors within the State, except as herein otherwise provided.
“Section 7. DISPOSITION OF CONTENTS OF GAMBLING DEVICE. — It shall be the duty of any sheriff or other officer seizing and removing any gambling device to open the same in any manner, in the presence of the register of the circuit court, in. equity, for the proper county, to take therefrom any money or property found therein, and to turn over and deliver to the said register said money or said property. The register shall safely keep said money and other property found in such gambling device, and if said device is condemned and forfeited as being in violation of the terms of this Act, the court shall direct in its decree that one-half of the money, or monies, taken therefrom, shall be paid to the officer making the seizure, and the remaining one-half shall be paid into the general fund of the county in which said gambling device was found and seized. Anything else found in said gambling device, such as candies, gums, merchandise, or other personal property, shall be disposed of as the court may in its decree direct.
*110 “Section 8. APPEAL LIES TO COURT OF APPEALS. — From any decree or judgment of the circuit court, in equity, condemning any device to be a gambling device, the party or parties aggrieved thereby may appeal to the Court of Appeals of Alabama, within fifteen days from the date of such decree or judgment, upon giving security for the cost of such appeal. And from any judgment or decree of the circuit court, in equity, denying the condemnation and forfeiture of any such device, the State may likewise appeal within fifteen days without the giving of any bond. When any person, firm, corporation, association of persons, or the State, appeals, the alleged gambling device shall remain in the custody of the sheriff until a final determination of the cause on appeal.
“Section 9. DECREE TO DIRECT DESTRUCTION OF GAMBLING DEVICE. — When any decree of condemnation and forfeiture is made in any case filed under the provisions of this Act, the judge or chancellor making such decree shall direct therein the destruction of said gambling device by the sheriff of said county in the presence of the register of the court; and said order or decree, in the event no appeal is taken, shall be carried out and executed before the expiration of twenty days from the date of the decree.
“Section 10. HOW COSTS ARE TO BE PAID. — Upon any decree of condemnation and forfeiture, the court, at its discretion, shall direct that the costs of the proceedings be paid by the person in whose possession said gambling device was found, or by any party or parties who claimed to own said gambling device, or any interest therein, and who contested its condemnation and forfeiture, and if such costs are not collected by execution, the register shall tax and collect such costs from the county in which said bill was filed, and same shall be paid as in criminal cases in which the State fails, upon the court making an order to that effect.
“Section 11. IF ONE PART OF ACT DECLARED VOID, OTHER SECTIONS NOT AFFECTED. — If, for any reason, any section, paragraph, provision, clause or part of this Act shall be held unconstitutional or invalid, that fact shall not affect or destroy any other section, paragraph, provision, clause or part of this Act not in and of itself invalid, but the remaining provisions shall be enforced without regard to those so invalidated.
“Section 12. This shall take effect on October 1st, 1931.”
Act No. 671, Ala. Acts 1931.
In addressing the original-purpose requirement, the Blackwell Court stated:
“It is true that said act as finally adopted is much broader than the bill as originally introduced and much more comprehensive as to details, but we do not think that the purpose of the bill was so changed as to violate section 61 of the Constitution. The main purpose of the bill as introduced was to prohibit the operation of punchboards and slot machines, and the bill as passed simply broadens the scope and purpose and prevents the possession, etc., of same which tends to prevent the operation of same. We therefore hold that the amendments or changes were mere extensions or related details and did not change the general purpose of the bill. Stein v. Leeper, 78 Ala. 517 [ (1885) ]; Hall v. Steele, 82 Ala. 562, 2 So. 650 [ (1887) ]; Alabama State Bridge Corp. v. Smith, 217 Ala. 311, 116 So. 695 [ (1928) ]. True, the bill as amended does not specifically mention punch-boards, but the instruments mentioned *111 and described could include punch-boards kept or used as a gaming device.”
Blackwell, 230 Ala. at 140, 162 So. at 311.
In Opinion of the Justices No. 153, 264 Ala. 176, 85 So.2d 391 (1956), the House of Representatives sought, among other things, an advisory opinion as to whether the amendment to the bill at issue so altered the bill as change its original purpose in contravention of § 61. The original bill stated that the purpose was to provide for the operation of public schools; the amendment provided that the purpose was to provide for public education, including institutions of higher learning. The Court noted that, under Alabama caselaw, public schools had never been understood to include higher institutions of learning like colleges and universities. The Court stated:
“However the purpose of a bill within the meaning of § 61 of the constitution is the general purpose of the bill, not mere details through which the purpose is to be manifested and effectuated. State Docks Commission v. State ex rel. Jones, 227 Ala. 521, 150 So. 537 [ (1933) ]. It is our duty to uphold the constitutionality of an act of the legislature by adopting any reasonable construction of which it is ' susceptible. Standard Oil Co. v. State, 178 Ala. 400, 59 So. 667 [ (1912) ]. And in determining the legislative intent in a bill we must look to the entire bill and not to isolated phrases or clauses in the bill. State v. Western Union Telegraph Co., 196 Ala. 570, 72 So. 99 [ (1916) ]. It will be noted that in the original bill the purpose of the bill as stated in section 4 is to prevent any deficit in the appropriations for any fiscal year made in Act No. 343 approved September 5, 1955. These appropriations according to Act No. 343 relate to public education, the normal schools and the institutions of higher learning, among others. It can, therefore, well be said that the Act as originally proposed relates to public education including institutions of higher learning when all of the provisions of the Act are considered. If this be true, then the term public schools in the original bill was used in a more comprehensive sense than that indicated by the afore-cited cases. In fact the amendment can be considered as clarifying the purposes and intent of the bill in its use of the term ‘public schools.’ Cook[e] v. Burke, 177 Ala. 155, 58 So. 984 [(1912)]; Blackwell v. State, 230 Ala.. 139, 162 So. 310 [ (1935) ]. Accordingly, the original purpose pf the bill is not changed by the amendment. In re Opinion of the Justices [No. 79 ], 249 Ala. 500, 31 So.2d 644 [ (1947) ]; In re Opinion of the Justices [No. 103 ], 252 Ala. 525, 41 So.2d 758 [ (1949) ].”
264 Ala. at 180, 85 So.2d at 394-95.
In Opinion, of the Justices No. 266, 381 So.2d 187 (Ala.1980), the Senate asked the Court whether § 61 had been violated by subsequent amendments to an original bill. The purpose of the bill as originally introduced was to transfer funds from the State insurance fund to be earmarked for Medicaid purposes. The Finance and Taxation Committee amended the bill to provide only for “medicaid and investigation of welfare fraud purposes.” The Court opined that the Committee’s amendment did include an additional earmarking provision, i.e., it provided that the transferred funds could be used for “investigation of welfare fraud.” However, that amendment was sufficiently germane and cognate to the original purpose of the original bill that the amendment did not violate § 61. Subsequently, another amendment was made to the bill to include funds to pay for cost-of-living'raises for certain education *112 personnel and State officials and for Medicaid emergency use and to appropriate the balance into the ETF (then known as the Special'Education Trust Fund). The ■Court held that the second amendment changed the natuhe of the bill from one earmarking funds into one appropriating funds and that the second amendment provided funds to pay cost-of-living raises for certain personnel and employees. The Court concluded that the second amendment’ changed 'the general purpose of the bill, which was to transfer certain" funds into the General Fund to-meet specified needs, to one that appropriated certain funds in violation of § 61.
In the present case, we cannot say that the substitute version of HB 84 so changed the, .original bill that its original purpose was changed in violation of- § 61. The purpose of a bill within § 61 has been held to be the general purpose. A determination of whether an amendment or substitute act changed the original purpose depends on whether the subject matter of the 'amendment or substitute was germane to the general purpose. The substitute version of HB 84 was not so diverse from the original purpose as to have no necessary connection to it. The purpose of the original bill in providing flexibility contracts was to advance the benefits of local school and school-systems autonomy in innovation and creativity by exempting the schools from certain State laws, including • State BOE rules, regülations, and policies, in exchange for academic and associated goals for students through flexibility contracts. The substitute bill contained the provisions for flexibility contracts between schools and the State BOE and included the tax-credit programs to provide for state accountability for students in failing schools. New matter may be included in an amended bill, so long as that new matter is germane to the general purpose. The prohibition in § 61 is directed to the introduction of matter that is not germane to the general purpose of the legislation or that is unrelated to its general purpose. We cannot say that the substitute version of HB 84 changed.the general purpose of the original bill so as render the AAA unconstitutional under § 61.

IV. Whether the AAA was enacted in violation of Art. IV, § Ó3, of the Alabama Constitution?

The plaintiffs challenge the constitutionality of the, AAA, arguing that the original version of HB 84 so differed substantially in form and substance from the substitute version of,HB 8,4 that the substitute version was not read on three different days in each house in violation of § 63. . Section 63 provides:
“Every bill shall be read on three different days in.each house, and no bill shall become a law, unless on its final .passage it be read at ,length, and the vote, be taken by yeas and. nays, the names of the members voting for and against the same be entered upon the journals, and a majority of each house be recorded thereon as voting in its favpr, except as otherwise provided in this Constitution.”
This Court has stated:,
“The requirement for several readings of subjects of consideration by legislative bodies as.directed to the purposes, among others, of preventing hasty and ill-advised action, to the assurance of cautious and deliberate judgment by the bodies.”
Jones v. McDade, 200 Ala. 230, 234, 75 So. 988, 998 (1917).
The circuit court here found Opinion of the Justices No. 12, 223 Ala. 365, 368, 136 So. 585, 588 (1931), to be persuasive in its analysis of the three-readings requirement. In Opinion of the Justices No. 12, *113 the Justices responded to the Governor’s request for an advisory opinion as to whether or not the legislature, in- proposing an amendment to the Constitution by Senate Bill No. 520, had complied with the provisions of § 284 of the Constitution,■■ which requires that a proposed amendment to the Constitution be read in each house on “three several days.” The original version of the proposed constitutional amendment was read three times in the Senate and passed. It was then sent to the House, where it was read once, and the House amended the original version. After nonconcurrence by the Senate,- the amended version of the proposed amend- - ment went to a conference committee, where it was again amended. .This last version of the proposed amendment was adopted by both the House and the Senate on the last legislative day.
The original version of the proposed amendment authorized the issuance of interest-bearing warrants for the purpose of paying a past-due indebtedness. The version that passed both houses on the last legislative day completely revised the system of taxation. The proposal to change the system of taxation then became the major subject and purpose of the proposed constitutional amendment. In its amended form, the proposed constitutional amendment was not read on three separate days in each house. The Court held invalid the proposed amendment as thus amended by the legislature, concluding that the changes in the subsequent versions of the proposed amendment were too drastic to come within the protection of the “principle that proposed amendments may be amended during the course of the legislative procedure for the purpose of perfecting the same and to harmonize with the judgment of the requisite majority of the two bodies” and “that the proposal of the amendment in question violated both the letter and spirit of section 284 of the Constitution, . and must be declared null and void.” 228 Ala. at 369, 136 So. at 588.
In Storrs v. Heck, 238 Ala. 196, 190 So. 78 (1939), a constitutional amendment was challenged on the ground that certain procedural requirements set forth in the Constitution were not followed, including the three-reading requirement of § 284. The proposed constitutional amendment, as it passed the House, suspended the constitutional limitations on the legislature’s authority to reduce compensation of State officials. It was amended in the Senate by a substitute bill to provide, among other things, á maximum compensation of $6,000 per annum for State officials. The House concurred in the Senate’s amended version, and the amendment was subsequently ratified by the electorate. The main argument was that the proposed constitutional amendment as voted on by the people did not receive the required three readings in haec verba in both houses. The Court held that the ■ Senate amendment limiting compensation was in the nature of a “legislative detail” and, therefore, did not constitute a departure from the original bill.
In Opinion of the Justices No. 224, 335 So.2d 373 (Ala.1976), one of the questions answered was whether the legislature had complied with the three-readings requirement of § 284. The original House bill proposed a constitutional amendment authorizing the issuance and sale of general obligation bonds in the principal amount of $7,000,000 to fund construction of secure mental-health facilities. It was read twice in the House. It was amended by a substitute bill that raised the authorization to $9,000,000 and, in addition, provided that part of the money be used to construct a seed-technology center and a seed-processing facility. That bill was read at length and passed in the House. It was then sent to the Senate and read at length twice. It *114 was amended in the Senate to authorize $15,000,000 in principal amount of bonds and to provide that a portion of the additional proceeds from the sale of the bonds, be used to construct prison-rehabilitation facilities. The amended bill was read at length and passed by the Senate.
The Court found that the amendments to the bill were not read in each house on “three several days” as required in § 284. However, the Court concluded that there had been substantial compliance with § 284. “The central question in the proposed constitutional amendment, posed by original House Bill 335, was whether Alabama would incur debt. No amendment of that bill changed that question. Each of the three readings in the respective houses of the Legislature posed that question to those houses.” 335 So.2d at 375.
In the present case, it is clear that the substitute version of HB 84 was not read “on three different days” in each house. However, we hold that an amended bill or a substitute bill, if germane to and not inconsistent with the general purpose of the original bill, does not have to be read three times on three different days to com-, ply with § 63. The legislature complies with the three-readings requirement if the three readings include the version before the substitution was made. On their face, the legislative journals indicate three readings of HB 84 in both houses even though the substitute version was read only once in each house. This practice complies with § 63 so long as the original bill and the amended or substitute bill are not vitally altered so that there is no longer a common purpose or relationship between the original bill and the amended or substitute bill.
Several state courts have held that a' substituted or amended bill is not a new bill necessitating rereading where its subject is germane to the original bill. Van Brunt v. State, 653 P.2d 343, 345 (Alaska Ct.App.1982) (holding that the reading requirement did not extend to amended bills, even those that have been “substantially alter[ed],” unless the subject matter of the bill is changed); People ex rel. Cnty. Collector v. Jeri, Ltd., 40 Ill.2d 293, 239 N.E.2d 777 (1968) (holding that constitutional requirement that bills be read three times does not extend to an amended bill when the amendments are germane to the general subject of the bill); People v. Clopton, 117 Mich.App. 673, 324 N.W.2d 128 (1982) (holding that when an original bill has met the procedural constitutional requirements for passage, an amended version or substitute bill need not also meet those requirements in its later form, so long as the amended version or substitute serves the same purpose as the original bill, is. in harmony with the objects and purposes of the original bill, and is germane thereto); State v. Ryan, 92 Neb. 636, 139 N.W. 235 (1912) (holding that where amendments have been made to a bill after its first or second reading, it is not required that the bill be read on three separate days); Frazier v. Board of Comm’rs, 194 N.C. 49,138 S.E. 433, 437 (1927) (holding that rereading of a bill is necessary only when the bill is amended “in a material matter”); Hoover v. Board of County Comm’rs, 19 Ohio St.3d 1, 5, 482 N.E.2d 575, 579 (1985) (holding that amendments that do not “vitally alter” the substance of a bill do not trigger a requirement that the amended bill be reconsidered three times); and Stilp v. Commonwealth, 588 Pa. 539, 905 A.2d 918 (2006) (holding that a bill-does not have to be considered on three separate days if amendments .to the bill during the legislative process are germane and do not change the general subject of the bill). Cf. Maybee v. State, 4 N.Y.3d 415, 417-18, 796 N.Y.S.2d 18, 828 N.E.2d 975 (2005) (discussing compliance with New York Constitutional requirement that *115 “no bill shall be passed or become a law unless it shall have been printed and upon the desks of the members, in its final form, at least three calendar legislative days pri- or to its final passage”). Accordingly, we cannot say that the failure to read the substitute version of HB 84 on three different days violated § 63 so as to render the AAA unconstitutional.

V. Whether the AAA was enacted in violation of Art. IV, §§ 15 and 71, of the Alabama Constitution?

In challenging the AAA under §§ 45 and 71, the plaintiffs alleged in Count III of their complaint that the AAA violates the “single-subject” requirements because Sections 5-7 of the AAA authorize the State BOE to enter into school-flexibility contracts with local school systems to allow exemptions from certain State laws or regulations in contrast to Sections 8 and 9, which create tax credits to pay for the education of schoolchildren in nonpublic schools. In Count IV, the plaintiffs allege that, because Section 8 “set(s) aside” sales-tax money from the ETF and deposits it into a Failing School Income Tax Credit Account, the AAA both repeals an earmark of funds and makes a new appropriation in one act. In Count V, the plaintiffs allege that because Section 9 provides for an income-tax credit to reimburse 100% of the amount contributed to scholarship-granting organizations, the AAA redirects income-tax revenue from the ETF and effectively repeals an earmark and appropriates funds in one bill.
Section 45 provides:
“The style of the laws of this state shall be: ‘Be it enacted by the legislature of Alabama,’ which need not be repeated, but the act shall be divided into sections for convenience, according to substance, and the sections designated merely by figures. Each law shall contain but one subject, which shall be clearly expressed in its title, except general appropriation bills, general revenue bills, and bills adopting a code, digest, or revision of statutes; and no law shall be revived, amended, or the provisions thereof extended or conferred, by reference to its title only; but so much thereof as is revived, amended, extended, or conferred, shall be re-enacted and published at length.”
(Emphasis added.)
Section 71 provides:
“The general appropriation bill shall embrace nothing but appropriations for the ordinary expenses of the executive, legislative, and judicial departments of the state, for interest on the public debt, and for the public schools. The salary of no officer or employee shall be increased in such bill, nor shall any appropriation be made therein for any officer or employee unless his employment and the amount of his salary have already been provided for by law. All other appropriations shall be made by separate bills, each embracing but one subject.”
(Emphasis added.)
The plaintiffs have alleged that the AAA violated the single-subject requirements of both § 45 and § 71. As the Court explained in Opinion of Justices No. 174, 275 Ala. 254, 154 So.2d 12 (1963), an appropriations bill that is not a general appropriations bill must meet the single-subject requirement of § 71. If an appropriations bill complies with § 71 in having a single subject, then it necessarily complies with that portion of § 45 mandating that each law contain but one subject.[8] *116 Section 45 contains the additional requirement that the subject of each law-“shall be clearly expressed in its title.”
The purpose behind the single-subject requirement has been stated to be:
“ ‘First, to prevent “hodgepodge” or “logrolling” legislation; second, to prevent surprise or fraud upon the legislature by means of provisions in bills of which the titles give no intimation, and which might, therefore, be overlooked, and carelessly and unintentionally adopted; and, third, to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects, of legislation that are being considered, in order that they may have the opportunity of being heard thereon, by petition or otherwise, if they shall so desire.’ Cooley, Const. Lim. 172. No one of these purposes, is of more or less importance than the other. The mischief of hodgepodge legislation, — the inclusion in one act of matters or subjects ‘of a very heterogeneous nature,’ which may mislead, and surprise the good faith of the law-making body; or logrolling legislation, intended to enlist varied, and, it may be, hostile, interests, in support of the proposed act, — would have been avoided if the constitutional limitation had gone no further than the requisition that ‘each law shall contain but one subject.’ The unity of subject is an indispensable element of legislative acts; but it is not the only element; the subject must be ‘clearly expressed in its title.’ The purpose of this requisition is, as expressed in the second proposition of the exposition of Judge Cooley, ‘to prevent surprise or fraud upon the legislature by means of provisions in bills of which the title gives no intimation, and which might therefore be overlooked,. and carelessly and unintentionally adopted.’ The third proposition must be deemed, and by all authority is deemed, of equal importance, — ‘to fairly apprise the people, through such publication of legislative proceedings as is usually made, of the subjects of legislation that are being considered, in order that they may have opportunity of- being heard thereon, by petition or otherwise, if they so desire.’ When there is a fair expression of the subject in the title, all matters reasonably connected with it, and all proper agencies or instrumentalities, or measures, which will or may facilitate its accomplishment, are proper to be incorporated in the act, and, as1 usually said, are cognate or germane to the title.”
Lindsay v. United States Sav. & Loan Ass’n, 120 Ala. 156, 172, 24 So. 171, 176 (1898) (addressing the single-subject requirement of the 1875 Constitution).
As early as 1909, this Court recognized:
“The history as well as the purpose of section 45 of the Constitution is now too well understood to require extended elucidation here. There was no design in this clause to embarrass legislation by making laws unnecessarily restrictive in *117 their scope and operation, and thus multiplying their number; but the framers of the Constitution meant to put an end to a species of vicious legislation commonly termed 'logrolling/ and to require, in every case, that the proposed measure shall stand upon its own merits, so that neither the members of the Legislature nor the people may be misled by the title. Ballentyne v. Wickersham, 75 Ala. 533 [(1883)]; Cooley’s Con. Lim. (7th Ed.) 117.”
State ex rel. Birmingham v. Miller, 158 Ala. 59, 62, 48 So. 496, 497 (1909).
We turn first to the Counts IV and V of the plaintiffs’ complaint in which they allege that the AAA violates the single-subject requirements of §§ 45 and 71 because Section 8 repealed an earmark on funds dedicated to the ETF while also making a new appropriation of those funds to pay for tax credits and because Section 9 repealed an earmark on funds dedicated to the ETF while also making a new appropriation of those funds to pay for tax credits for donations .to scholarship-granting organizations. Because, as we discuss infra, Section 8 does not make an “appropriation,” the circuit court erred in concluding that the AAA violated the single-subject requirement in Sections 8 and 9. However, the plaintiffs have also argued that the AAA violated the single-subject requirement of §§ 45 and 71 because, they argue, the school-flexibility contracts in Sections 5-7 are a separate subject from the tax-credit programs in Sections 8 and 9, as set out in Count III. of their complaint.
The plaintiffs argue that Sections 5-7 create a mechanism by which public schools can enter into contracts with the State to obtain exemptions from certain state regulations and that these sections contain nothing about tax credits, private schools, scholarship-granting organizations, or assistance to parents of students who transfer from public to nonpublic schools. They argue that the two tax-credit programs in Sections 8 and 9 do nothing to advance or impact and that they have no relevancy to the local school-flexibility contracts. The plaintiffs contend that the circuit court was correct in rejecting the argument that the single subject of the AAA was “education” based on Opinion of the Justices No. 323, 512 So.2d 72 (Ala.1987).
In Opinion of the Justices No. 323, the Court was asked for its opinion on the constitutionality of a bill that would provide appropriations for public educational purposes generally and, more specifically, • for the elementary and secondary schools of the State; ■ for junior and technical colleges; for colleges and universities; for various other State agencies; and for entities that are not State agencies, but some of which, at least arguably, serve educational purposes. The constitutional provisions at issue were § 45, which requires that bills, except for' general appropriation bills, contain only one subject, and § 71, which restricts the contents of general appropriation bills. The Court explained that the bill was not a general appropriation bill. The general appropriation bill that is exempt from the single-subject requirement under § 45 and shall embrace nothing but appropriations for the ordinary expenses of the ■ “executive, legislative, and judicial departments, ... and for public schools” under § 71 cannot be bifurcated. The Court explained that another reason the bill was not a general appropriations bill was because the Court had held that “public schools,” as that term is used in § 45, includes only elementary and secondary schools-. Because the bill at issue included technical schools, junior colleges, and universities, then the bill was not a general appropriations bill. The Court *118 concluded that the bill was governed by the single-subject requirements of §§ 45 and 71.
The Court,' in discussing whether the title of the bill clearly contained only one subject, acknowledged that the appropriations for public education would be a very broad subject. ' The Court also acknowledged that a statute may have a very broad subject with numerous provisions and still comply with the single-subject provisions of the Constitution so long as those provisions relate to the same subject. The Court went on to explain the history of how Alabama progressed to the point where a separate appropriation bill for public education is much larger than the general appropriation bill and why the general appropriation bill no longer appropriates money for public schools. 512 So.2d at 76-77. The Court concluded that appropriations for public education have been treated as a single subject since 1927,
“and throughout that time the education appropriation bill has had such a consistent content as to define that single subject. These appropriations have been made in this way for so long that neither legislators nor the public could fail to be put on notice of the content of the education appropriation bill. Therefore, we are of the opinion that the title of HB 269 adequately expresses the single subject of the bill.... ”
512 So.2d at 77. However, the Court went on to hold that the bill violated § 45 and § 73 (appropriations to charitable or educational institutions not under the absolute control of the State) because some of the appropriations for “public education” were to “non-State agencies.” 512 So.2d at 78. The Court opined that the appropriations to the non-State agencies should be eliminated. The Court also noted that whether appropriations to State agencies for education purposes, such as an appropriation to the State health department for immunization of schoolchildren, would have to wait for a later determination because the description in the bill was too general.
We recognize that the Court in Opinion of the Justice No. 323 opined that part of the education appropriation bill violated § 45 because it made appropriations to non-State agencies. We also recognize that the Court concluded that because public-education funding had been treated as a separate bill for so long the bill complied with § 45 because it put the public and the legislature on notice of the content of the education appropriation bill. However, as discussed infra, the AAA does not involve any “appropriations,” and the single-subject at issue in the AAA is education reform through accountability. This Court recognized in Bagby Elevator & Electric Co. v. McBride, 292 Ala. 191, 195-96, 291 So.2d 306, 310 (1974), that, if the subject is stated in broad terms, then naturally a broader range of provisions will relate to the subject.
The plaintiffs contend that the flexibility contracts to allow for creativity and innovation in schools are unrelated to tax credits and scholarships that do not help public schools and do nothing to reform education or make failing schools more accountable because they contend the tax credits will negatively impact public schools. The State defendants contend that providing parents and students with additional educational options is education reform, just as is allowing local school systems “struggling to improve academic outcomes and close the achievement gap” to enter into flexibility contracts. The State defendants argue that giving parents additional educational options will make failing schools, i.e., ones “struggling to improve academic outcomes,” more accountable to parents and that those schools will need to improve in order to get off of the State’s list of *119 “faffing schools” if they wish to retain students (and the state funds that accompany them).
“ ‘[A] statute has but one subject, no matter to how many different matters it relates if they are all cognate, and but different branches of the same subject.’ ” Ex parte Hilsabeck, 477 So.2d 472, 475 (Ala.1985) (quoting Knight v. West Alabama Envtl. Improvement Auth., 287 Ala. 15, 22, 246 So.2d 903, 908 (1971)).
“ ‘It is settled under our decisions that however numerous the subjects stated in the title, and however numerous the provisions in the body of the act may be, if they can be by fair intendment considered as faffing within the subject-matter legislated upon in the act, or necessary as ends and means to the attainment of such subject, the act does not offend our constitutional provision that no law shall embrace more than one subject, which must be expressed in its title.’ ”
Alabama State Fed’n of Labor v. McAdory, 246 Ala. 1, 10, 18 So.2d 810, 816 (1944)(quoting State v. Henry, 224 Ala. 224, 227, 139 So. 278, 281 (1931)(emphasis added)). We cannot say that the means by which the legislature chose to embrace education reform' and accountability— through flexibility contracts and tax credits — did not attain the end. The parties disagree as to the effect the tax credits will have on education; this alone, hqwever, does not indicate that the school-flexibility contracts address a different subject than the provisions in Sections 8 and 9 creating the tax-credit programs. The purpose of the single-subject requirements is not to resolve such a disagreement. Accordingly, the AAA does not violate the single-subject requirements of §'§ 45 and 71.

VI. Whether the tax-credit provisions of the AAA violate Art. IV, § 73, of the Alabama Constitution?

The plaintiffs have presented a constitutional challenge to the tax-credit provisions of the AAA. Section 8 and Section 9 of the AAA are now codified at § 16-6D-1 et seq. Section 16-6D-8(a)(l)(formerly a part of Section 8) of the AAA provides a refundable Alabama income-tax credit “to the parent of a student enrolled in or assigned to attend a failing school to help offset the cost of transferring the student to a nonfailing public school or nonpublic school of the parent’s choice.” The income-tax credit is an amount equal to 80% of the “average annual state cost of attendance” for a public K-12 student during the relevant tax year or the actual cost of attending a nonfailing public school or nonpublic school, whichever is less. § 16-6D-8(a)(l).[9] If the income-tax liability of a parent of a transferring student is less than the total credit allowed, the taxpayer is entitled to a refund or rebate ¿qual to the balance of the unused • credit. § 16-6D-8(a)(l). Section 16-6D-8(a)(2) of the AAA provides that the authorized tax credits “shall be paid out of sales tax collections made to the Education Trust Fund,, and set aside by the Comptroller in the Failing Schools Income Tax Credit Account.” The AAA does not require a nonfailing public or nonpublic school to enroll any student seeking a transfer from a faffing school *120 under the AAA. See § 16-6D-8(d)(l), Ala. Code 1975.
Section 16-6D-9(a)(2)(forrnerly a part of Section 9) of the AAA also creates a scholarship program whereby individual taxpayers may claim a tax credit up to certain limits for total contributions made to scholarship-granting organizations who, in turn, provide educational scholarships to students attending a failing school so that those students may attend a nonfailing public or nonpublic school. Section 16-6D-9(a)(3) further authorizes tax credits to be claimed by corporate taxpayers up to certain limits for contributions made to scholarship-granting organizations. The AAA imposes various administrative accountability and academic standards upon the scholarship-granting organizations.
The plaintiffs alleged in Count VI of their complaint that the tax-credit provisions of the AAA violate Art. IV, § 73, of the Alabama Constitution of 1901. Section 73 provides that
“[n]o appropriation shall be made to any charitable or educational institution not under the absolute control of the state, other than normal schools established by law for the professional training of teachers- for the public schools of the state, except by a vote of two-thirds of all the members elected to each house.”[10] . ..
The plaintiffs asserted in their complaint that the AAA appropriates funds from the ETF to finance the tax credits provided for by § 16-6D-8(a)(2)(formerly a part of Section’8) of the AAA and made available to the parents of students attending failing schools, in order to “reimburse [those parents for] tuition and fees paid to nonpublic schools, which by the statute’s own definition are ‘not under the jurisdiction of the State Superintendent of Education and the State Board of Education.’ ” The plaintiffs alleged that “[b]y appropriating public funds in this manner, the AAA effectively provides for an appropriation to educational institutions that are not under the absolute control of the State.” The plaintiffs also asserted that the income-tax credit found in §§ 16-6D-9(a)(2) and (3), which provides a tax credit to those individuals and corporations that have made a contribution to a scholarship-granting organization, “channeled] to charitable organizations monies that otherwise, would have gone to the public [and] is the functional equivalent, in all respects, of an appropriation to such charitable institutions that are not under the absolute control of the State.” The plaintiffs alleged that because the AAA provides for appropriations to educational and charitable institutions that are not under the absolute control of the State, and because those appropriations were not approved by a two-thirds vote of all members of each house, the AAA violates § 73.
In its order, the circuit court found that the tax-credit provisions of the AAA constituted a prohibited appropriation to a charitable, or educational institution in contravention of § 73. Specifically, the circuit court stated:
“The AAA contains an appropriation of public funds to pay for the refundable tax credits provided by Section 8 to parents in reimbursement of the cost of private school tuition. It is not disposi-tive that the funds appropriated by Section 8 reach the private schools indirectly- rather than directly. The intent of the appropriation is to pay the tuition for eligible students to attend private schools; this is the purpose for which the funds are appropriated, and parents receive the tax refunds only in reim *121 bursement of money they have spent for that purpose. It has long been established that ‘the legislature cannot do indirectly that which it is forbidden to do directly.’ Ex parte State ex rel. Patterson, 108 So.2d 448, 458 (Ala.1958). An instructive case is Haley v. Clark, 26 Ala. 439 (1855), in which the Aábama Supreme Court held that the Constitu-' tion reserved to the executive branch the power to grant pardons and remit fines, and that the-legislature could not circumvent this restriction on its authority ' through [a] bill refunding certain fines after they had been paid. So too here, the legislature cannot avoid the constitutional limitation on appropriating funds to private charitable and educational ■ institutions by instead reimbursing to parents the cost of their tuition payments at such institutions.
“The Section 9 tax credit for ‘donations’ to charitable scholarship-granting organizations is equally problematic. Because this tax credit reimburses such donations in full, there is in fact no private contribution, but simply a redirection of funds from the public fisc to scholarship-granting organizations. If it were possible for the legislature by this artifice to avoid the Constitution’s funding restrictions, Section 73 — and numerous other constitutional provisions that place restrictions on the use of public funds — would be rendered toothless.”
Thus, the circuit court concluded that the tax credits violated § 73 because the credits had the practical effect of being an “appropriation” of public funds to nonplub-lic educational institutions. The circuit court reasoned that the tax credits prevented the State from collecting income-tax revenues that it would have otherwise been entitled to collect had it not been for the tax credits.
The State defendants argue on appeal that the circuit court erred in concluding that §§ 16-6D-8 and -9 constitute unconstitutional appropriations because, they say, the tax credits found in the AAA do not “appropriate” public funds for the benefit of non-State charitable -or educational institutions. The State defendants contend that the Aabama Constitution expressly recognizes that “appropriations” relate to “money in the state treasury” and cannot be construed to include tax credits.
‘“We are cognizant that the long-settled and fundamental rule binding this Court in construing provisions of the constitution is adherence to the plain meaning of the text.’ ” Town of Gurley v. M & N Materials, Inc., 143 So.3d 1, 13 (Ala.2012) (quoting Jefferson Cnty. v. Weissman, 69 So.3d 827, 834 (Ala.2011)). “ ‘[T]he Constitution is not to have a narrow of technical construction, but must be understood and enforced according to the plain, common-sense meaning of its terms.’ ” Houston Cnty. Econ. Dev. Auth. v. State, 168 So.3d 4, 18 (Ala.2014) (quoting Hagan v. Commissioner’s Court of Limestone Cnty., 160 Ala. 544, 554, 49 So. 417, 420 (1909)). “ ‘ “In construing a constitutional provision, the courts have no right to broaden the meaning of words used and, likewise, have no right to restrict the meaning of those words.” ’ This Court is ‘ “not at liberty to disregard or restrict the plain meaning of. the provisions of the Constitution.” ’ ” City of Bessemer v. McClain, 957 So.2d 1061, 1092 (Ala.2006) (quoting City of Birmingham v. City of Vestavia Hills, 654 So.2d 532, 538 (Ala.1995), quoting in turn McGee v. Borom, 341 So.2d 141, 143 (Ala.1976)).
Traditional definitions of “appropriations” do not extend to include tax credits. Appropriations have been defined as “[t]he act by which the legislative department of government designates a particular fund, *122 or sets apart a specified portion of the public revenue or of the money in the public treasury, to be applied to some general object of governmental expenditure, or to some individual purchase or expense.” Blank’s Law Dictionary 93 (5th ed.1979); Toney v. Bower, 318 Ill.App.3d 1194, 744 N.E.2d 351, 253 Ill.Dec. 69 (2001); McAlpine v. University of Alaska, 762 P.2d 81, 87 (Alaska 1988) (“ ‘An appropriation is the setting aside from the public revenue of a certain sum of money for a specified object, in such a manner that the executive officers of the government are authorized to use that money, and no more, for that object, and no other.’ ” (quoting State ex rel. Finnegan v. Dammann, 220 Wis. 143, 264 N.W. 622, 624 (1936))).
In contrast to an appropriation, a tax credit has been defined as “[a]n amount subtracted directly from one’s total tax liability, dollar for dollar, as opposed to a deduction from gross income.” Black’s Law Dictionary 1689 (10th ed.2014); Toney, supra; see also Gilligan v. Attorney General 413 Mass. 14, 17, 595 N.E.2d 288, 291 (1992) (holding that the “proposed tax credits did not set aside monies in the treasury and, thus, could not be viewed as an appropriation”).
Article XI, § 213, of the Alabama Constitution of 1901, provides, in part, as follows:
“[I]t shall be unlawful from and after the adoption of this amendment for the state comptroller of the state of Alabama to draw any warrant or other order for the payment of money belonging to, or administered by, the state of Alabama upon the state treasurer, unless there is in the hand of such treasurer money appropriated and available for the full payment of the same. In case there is, at the end of any fiscal year, insufficient money in the state treasury for the payment of all proper claims presented to the state comptroller for the issuance of warrants, the comptroller shall issue warrants for that proportion of each such claim which the money available for the payment of all said claims bears to the whole, and such warrants for such prorated sums shall thereupon be paid by the state treasurer. At the end of each fiscal year all unpaid appropriations which exceed the amount of money in the state treasury subject to the payment of the same after the proration above provided for, shall thereupon become null and void to the extent of such excess.”
Article IV, § 71, of the Alabama Constitution of 1901, involving certain restrictions on the general appropriations bill, relates only to legislative appropriations from the State treasury. State v. Street, 117 Ala. 203, 23 So. 807 (1898). Additionally, “[n]o money shall be paid out by the treasury except upon appropriations made by law, and on warrant drawn by the proper officer in pursuance thereof.” Art. IV, § 72, Ala. Const. 1901. “All appropriations are paid out of revenue.” Opinion of the Justices No. 78, 249 Ala. 389, 390, 31 So.2d 558, 559 (1947) (addressing whether a proposed bill had to originate in the House). Clearly, the aforementioned provisions of the Alabama Constitution expressly contemplate appropriations being directly related to moneys in the State treasury because it is those public funds that would ultimately satisfy the particular designated appropriation. Additionally, nothing in the plain text of § 73 defines an appropriation as relating to or including a tax credit. Furthermore, nothing in § 73 can be read as indicating that its drafters intended the term “appropriations” to be construed in a manner to include tax credits.
The State defendants also contend that the tax credits do not violate § 73 because, *123 they say, the State does not pay public funds to individual non-State charitable or educational institutions. Rather, they say, the refundable tax credits in § 16-6D-8 (formerly Section 8) are made to the parents of students transferring from a failing public school.
In Alabama Education Ass’n v. James, 878 So.2d 1076 (Ala.1979), the Alabama Education Association (“the AEA”) and others challenged the constitutionality of the Alabama Student Grant Program. The Student Grant Program established a student-assistance program that provided state-tuition grants to eligible students seeking a postsecondary education. Unlike the AAA, the student-grant program did not provide tax credits to the students’ parents. Rather, the student-grant program paid the tuition grants directly to postsecondary institutions on behalf of the eligible students. The act establishing the student-grant program, among other things, prohibited the use of grants for sectarian purposes and prohibited the use of money raised for the support of public schools to support schools of a predominantly sectarian or denominational character.
Nonetheless, the AEA and other plaintiffs sought injunctive and declaratory relief, arguing that the act violated, among other things, Art. XIV, § 263 of the Alabama Constitution of 1901, which provides: “No money raised for the support of the public schools shall be appropriated to or used for the support of any sectarian or denominational school.” The plaintiffs in James also alleged that the act failed to receive the two-thirds vote of each house as required by § 73 for appropriations to charitable or educational institutions not under the control of the State. Following a hearing, the trial court entered an order, among other things, dismissing the AEA as a plaintiff for lack of standing and declaring that the act was constitutional on its face. Id.
On appeal, this Court concluded that the act did not violate § 263 because (1) the act did not appropriate any money;[11] and (2) the grants provided for by the act were “not for the support of the individual schools but [were] for the benefit of the individual students and the state educational system.” James, 373 So.2d at 1081 (emphasis added). This Court also concluded that the act did not violate § 73 in that a two-thirds vote of each house was not required because the act did not appropriate any moneys. Id.
The reasoning applied by this Court in disposing of the § 263 claim in James is likewise applicable to this case. Article IV, § 73, provides that “[n]o appropriation shall be made to any charitable or educational institution not under the absolute control of the state.” The tax credits provided by the AAA are even further removed from State involvement than the grant program upheld against a constitutional challenge in James, because, unlike the grant program at issue in James, the State does not pay money directly to the educational institution. Rather, in the case of the refundable tax credit provided by § 16-6D-8, the tax credit is paid to the parents of a child who transfers from a failing public school to a nonfailing public school or nonpublic school for the purpose of offsetting any expenses incurred by the student’s transfer. Thus, no money is set aside or specified from the public revenue or treasury to be applied to a charitable or educational institution. Toney, supra, McAlpine, supra. We recognize that the tax credits provided by 16-6D-8 are paid out of sales-tax collections made to the ETF. Nevertheless, the tax credits are *124 paid to the parents of a transfemng student in order to offset the costs associated with the student’s transfer and are not “made to any charitable or educational institution not under the absolute control of the state.”. Art. IV, § 73.
Likewise, in the case of the tax credit provided by § 16-6D-9(a)(2)(formerIy a part of Section 9) to individual taxpayers for contributions made to scholarship-granting organizations, no appropriations are made to any charitable or educational institution. Rather, monetary contributions are made to scholarship-granting organizations by the taxpayer; those organiza-' tions, in turn, grant educational scholarships based on certain prescribed criteria to students attending, a failing school so that those students may attend a nonfail-ing public or nonpublic school. The individual taxpayer' then may claim a tax credit in an amount equal to the total contribution made to the scholarship-granting organization. Again, no money is set aside or specified from the public revenue or treasury to be applied to a charitable or educational institution. Toney, supra, McAlpine, supra. Thus, there is no appropriation made to charitable or educational institution. The individual taxpayer simply receives a tax credit — as that term has traditionally been defined— for monetary contributions made to a scholarship-granting organization.
Other courts have rejected the “tax credit as a de facto appropriation approach” argued by the plaintiffs and adopted by the circuit court in this case. In Kotterman v. Killian, 193 Ariz. 273, 972 P.2d 606 (1999), the plaintiffs challenged the constitutionality, of an Arizona law that allowed a state tax credit of up to $500 for those who chose to donate to school-tuition organizations (similar to scholarship-granting organizations) that, in turn, used the donated funds to offer scholarships to students to attend nongovernmental primary or secondary schools. The plaintiffs contended, among other things, that the tax credit violated the Arizona state constitution because it channeled public money to private and sectarian schools. The Arizona Supreme Court rejected this argument, holding that the tax credit did not constitute an appropriation:
“[N]o money ever enters the state’s control as a result of this tax credit. Nothing is deposited in the state treasury or other accounts under the management or possession of governmental agencies or public officials. Thus, under any common understanding of the words, we are not here dealing with ‘public money.’ ”
Kotterman, 193 Ariz. at 285, 972 P.2d at 618. The court went further and expressly rejected the rationale offered by the plaintiffs in this case and relied upon by the circuit court, i.e., that tax credits are public funds because, but for the tax-credit provisions of the AAA* the State would have collected and deposited the income-tax revenues into the State treasury:
“Petitioners suggest, however, that because taxpayer money could enter the treasury if it were not excluded by way of the tax credit, the state effectively controls and exerts quasi-ownership over it. This expansive interpretation is fraught with problems. Indeed, under such reasoning all taxpayer income could be viewed as belonging to the state because it is subject tó taxation by the legislature. That body has plenary power to set tax rates, categorize taxable income, and determine the type and amount of adjustments including deductions, exemptions, and credits....
[[Image here]]
“We do not accept the proposition, implicit in petitioners’ argument, that the tax return’s purpose is to -return *125 state money to taxpayers. For us to agree that a tax credit constitutes public money would require a finding that state ownership springs into existence at the point where taxable income is first determined, if not before. The tax on that amount would then instantly become public money. We believe that such a conclusion is both artificial and premature. It is far more reasonable to say that funds remain in the taxpayer’s ownership at least until final calculation of the amount actually owed to the government, and upon which the state has a legal claim.”
Kotterman, 198 Ariz. at 285, 972 P.2d at 618 (footnote omitted). See also Arizona Christian Sch. Tuition Org. v. Winn, 563 U.S. 125, 131 S.Ct. 1436, 1447, 179 L.Ed.2d 523 (2011)(stating that “[w]hen Arizona taxpayers choose to contribute to (student-tuition organizations], they spend their own money, not money the State has collected from ... taxpayers”).
In Toney, supra, the plaintiffs brought a declaratory-judgment action challenging the constitutionality of a law that permitted an income-tax credit up to $500 against income-tax liability equal to 25% of qualified education expenses incurred by students attending K-12 at any public or private school. The plaintiffs argued, among other things, that the credit reduced the state’s annual revenue and had the practical effect of being a legislative appropriation. The trial court entered an order denying the plaintiffs’-motion for a summary judgment, holding: (1) that the money accruing from the credit was not public money and (2) that the credit did not provide support for sectarian schools, reasoning that the money is not public until it belongs to the state and the fact that a state allows individual taxpayers to keep more of their own money does not make the money kept the state’s money.
In affirming-the trial court’s order denying the plaintiffs’ motion for a summary judgment, the Toney court stated:
“The trial court found that the Credit did not violate the constitutional provisions cited by plaintiffs because it does not constitute public funds but merely allows people to keep more of their own money. Plaintiffs argue that following the trial court’s reasoning would permit the State to do indirectly through the Tax Code what it cannot do directly. Plaintiffs insist that the effect of - reimbursing parents for private school tuition expenses through the Credit is exactly the same as reimbursing .them through payments from the State treasury. The cost of a tax benefit given to certain taxpayers is necessarily borne by other taxpayers in the form of higher taxes or reduced services;, thus, these taxpayers are compelled to support the religious preferences of those who will be able to claim the Credit.
[[Image here]]
“... Defendants and intervenors urge us to give the terms ‘public fund’ and ‘appropriation’ their plain, and ordinary meaning, as did the trial court.
“ ‘Public fund’ is defined in Black’s Law Dictionary as, T. The revenue or money of a governmental body. 2. The securities of the national government or a state government.’ Black’s Law Dictionary 682 (7th ed.1999). In contrast, ‘tax credit’ is defined as ‘[a]n amount subtracted directly from one’s total tax liability, • dollar for dollar, as opposed to a deduction from gross income.’ Black’s Law Dictionary 1473 (7th ed.1999).
“Plaintiffs direct us to no evidence demonstrating that the framers of the Illinois Constitution intended the term ‘public fund’ to have the broad, expansive'meaning that plaintiffs would give it. Giving the term such a meaning may *126 have broad implications for other tax credits, deductions, and exemptions from taxation, such as the property tax exemption for property used exclusively for religious purposes (35 ILCS 200/15-40 (West 1998)) and the partial state income tax exemption for religious organizations (35 ILCS 5/205(a) (West 1998)). We are unwilling to interpret the term ‘public fund’ so broadly as to endanger the legislative scheme of taxation.
“Similarly, the Credit does not constitute an ‘appropriation,’ as that term is commonly understood. An appropriation involves “‘the setting apart from public revenue a certain sum of money for a specific object.” ’ American Federation of State, County & Municipal Employees v. Netsch, 216 Ill.App.3d 566, 567, 159 Ill.Dec. 138, 575 N.E.2d 945, 946 (1991), quoting Illinois Municipal Retirement Fund v. City of Barry, 52 Ill.App.3d 644, 646, 10 Ill.Dec. 439, 367 N.E.2d 1048, 1049 (1977). Accordingly, we reject plaintiffs’ argument that a tax credit constitutes a public fund or an appropriation of public money....”
Toney, 318 Ill.App.3d at 1198-1200, 744 N.E.2d at 357-358, 253 Ill.Dec. at 75-76.
In Griffith v. Bower, 319 Ill.App.3d 993, 747 N.E.2d 423, 254 Ill.Dec. 383 (2001), the plaintiffs brought a subsequent challenge to the Illinois income-tax credit, alleging that the tax credit had the effect of giving aid to children in religious schools that is not likewise given to children in public schools in violation of the Illinois Constitution. As part of their argument, the plaintiffs contended that a tax credit was an expenditure; therefore, they asserted, the support of religious education through tax credits is an appropriation or payment of public funds for sectarian purposes. The trial court dismissed the plaintiffs’ action.
On appeal, the Illinois appellate court, as it did in Toney, supra, rejected the plaintiffs’ argument that the tax credit was in the nature of an appropriation stating:
“The credit at issue here does not involve any appropriation or use of public funds. See Toney, 318 Ill.App.3d at 1200, 253 Ill.Dec. 69, 744 N.E.2d 351. No money ever enters the state’s control as a result of this tax credit. Rather, the Act allows Illinois parents to keep more of their own money to spend on the education of their children as they see fit and thereby seeks to assist those parents in meeting the rising costs of educating their children.”
Griffith, 319 Ill.App.3d at 995-996, 747 N.E.2d at 426, 254 Ill.Dec. at 386.
Based on the foregoing, we conclude that the circuit court’s construction of the term “appropriation” to include the tax credits provided by AAA is contrary to the Alabama Constitution, existing caselaw, and the commonly accepted definition of the term appropriation.

VII. Whether the tax-credit provisions of the AAA violate Art. XI, § 211.02, of the Alabama Constitution?

The plaintiffs alleged in Count VII of their complaint that the tax credit provided by § 16-6D-9 (formerly Section 9) of the AAA violates Art. XI, § 211.02(B)(2), of the Alabama Constitution of 1901 (Off. Recomp.), which provides, in part, that “all net proceeds” of the state income tax, after deducting certain amounts for purposes described in § 211.02(B)(1), “shall be placed in the state treasury to the credit of the Alabama special education trust fund to be used for the payment of public school teachers salaries only.” The plaintiffs asserted in Count VII that by providing an income-tax credit to reimburse 100% of the amount contributed by a taxpayer to a scholarship-granting organization, § 16-6D-9 redirects income-tax revenue that *127 would otherwise be deposited into the ETF. Therefore, the plaintiffs alleged that § 16-6D-9 violated § 211.02(B)(2) of the Alabama Constitution of 1901, by permitting income-tax revenue that would otherwise be deposited into the ETF to be used for a purpose other than the payment of public-school-teacher salaries.
In determining that § 16-6D-9 of the AAA violated § 211.02(B)(2), the circuit court stated:
“In this instance, Section 9 of the AAA uses funds that otherwise would have been deposited into the ETF — up to $25 million each year — for a purpose other than the payment of public school teachers’ salaries. Instead, these funds go to pay for the education of certain schoolchildren in nonpublic schools— contrary to the intent and purpose of [§ 211.02(B)(2) ]. For reasons discussed above in connection with Section 73, the contention that the funds going to scholarship-granting organizations under Section 9 are private contributions rather than income tax revenue ignores the real substance of the matter, and if accepted would allow the legislature to circumvent the constitutional restrictions by doing indirectly what it is clearly prohibited from doing directly.”
The State defendants argue that the AAA tax credits do not use income-tax proceeds for purposes .other than the. payment of public-school-teacher salaries. Specifically, the State defendants contend that, although the tax credits provided by § 16-6D-9 do reduce the amount of revenue entering the State treasury, they do not constitute “net proceeds” and in no way redirect any revenue already held in the State treasury to any purpose other than paying public-school-teacher salaries. We agree.
The phrase “all net proceeds” of the state income tax is not defined in § 211.02. “Gross Proceeds” has been defined as “ ‘[t]he entire proceeds!;] [t]he proceeds of a sale or of a collection without deduction for cost, commissions, or any other expenses whatsoever.’ ” Lee v. BSB Greenwich Mortg. Ltd. P’ship, 267 F.3d 172, 179 (2d Cir.2001) (quoting Ballentine’s Law Dictionary 537 (3d ed.1969)). This Court has defined “net proceeds” as “‘[g]ross proceeds, less charges which may be rightly deducted.’ ” Opinion of the Justices No. 385, 69 So.3d 847, 856 (Ala.2011)(quoting Black’s Law Dictionary 1041 (6th ed.1990)). In Opinion of the Justices No. 385, this Court considered whether a Senate bill, which, as part of an economic-development plan, allowed, certain qualified employers to retain a percentage of state income taxes withheld from the pay of eligible employees, violated § 211.02 of the Alabama Constitution. In. determining that the Senate bill did violate § 211.02, this Court stated:
“[T]he legislature may not prevent any amounts that are withheld from employees’ paychecks pursuant to state-income-tax laws from becoming state-income-tax proceeds to be deposited into the appropriate funds simply by allowing an approved entity to retain those amounts once collected, rather than turning them over to the State. As soon as an employer withholds state income tax from an employee’s paycheck, the amount withheld becomes gross proceeds of the state income tax .... [W]e are clear 'to the conclusion that any attempt to bypass the provisions of § 211.02 by allowing ah approved entity to retain a portion of the state income taxes withheld from employees would amount to an unconstitutional diversion of some net proceeds of the state income tax because, even allowing for any otherwise appropriate deductions from the state income taxes withheld, at a minimum, some por *128 tion of the percentage of such state income taxes that would be retained by an approved entity would constitute net proceeds of the state income tax.”
69 So.3d at 858. Central to this .Court’s conclusion that the Senate bill at issue in Opinion of the Justices No. 385 violated § 211.02 was the fact that the Senate bill contemplated an income tax actually being collected by the State through the employer acting as the agent[12] for the State. Once the state income tax was withheld from the employee’s paycheck by the employer it became “gross proceeds” of the State, subject to lawful deductions and disposition as mandated by § 211.02. Thus, any diversion of the resulting “net proceeds” in a manner not dictated by § 211.02 was unconstitutional. Id. Here, the State never actually collects income tax from the taxpayer, i.e., “gross proceeds” pursuant to the tax credit provided in § 16-6D-9. Because there are no “gross proceeds” actually collected, there can be no “net proceeds” produced that are being appropriated for purposes other than the payment of public-school-teacher salaries. The tax credit provided by § 16-6D-9 merely allows the taxpayers to retain more of their earned income as an incentive to contributing to scholarship-granting organizations. When the taxpayers contribute to scholarship-granting organizations, they spend their own money and not public revenue actually collected by the state. See Arizona Christian Sch. Tuition Org. v. Winn, 563 U.S. at -, 131 S.Ct. at 1447 (holding that tax credits allow taxpayers to ■ spend their own money and not money the state has collected from other taxpayers).
Based on the foregoing, we conclude that the tax credit provided by § 16-6D-9 does not violate § 211.02 of the Alabama Constitution of 1901.

VIII. Whether the tax-credit provisions of the AAA violate Art. XI. § 213, of the Alabama Constitution?

The plaintiffs, in Count VIII of their complaint, alleged that the refundable tax credit provided by Section 8 was unconstitutional because, they say, it violates § 213, which provides, in part, that “[a]ny act creating or incurring any new debt against the state, except as herein provided, shall be absolutely void.” Specifically, the plaintiffs alleged that § 16-6D-8 of the AAA “creates a new obligation that binds the State annually to make payments to taxpayers, whether in the form of refunds, rebates, or credits to help fund the cost of sending children to a nonfailing public school or [a] nonpublic school.” The plaintiffs further alleged that the AAA pledges funds from existing revenue streams to satisfy this new obligation of the State without placing a limit on the total amount of money the State would be obligated to pay the taxpayers each year.
In determining that the refundable tax credit provided by Section 8 of the AAA violated § 213, the circuit. court stated:
“The Constitution provides, with limited exceptions not applicable here, that ‘no new debt shall be created against, or incurred by the state,’ and that ‘any act creating or incurring any new debt against the state ... shall be absolutely void.’ Ala. Const. Art. XI, § 213 (as amended by Amendment 26). Section 213 ‘prevents the legislature from enacting laws that would deplete the funds available and necessary to meet the state’s current obligations in future *129 years.’ Opinion of the Justices No. 359, 692 So.2d 825, 826-27 (Ala.1997).
“Legislation creates a debt when an ‘obligation is imposed on the state to pay money.’ Ala. Alcoholic Beverage Control Bd. v. City of Pelham, 855 So.2d 1070, 1081 (Ala.2003) (quoting Opinion of the Justices No. 316, 665 So.2d 1357, 1361 (Ala.1995)). The AAA imposes obligations on the State to pay in the form of tax refunds to parents who claim the Section 8 refundable tax credit. Section 8 is written in mandatory terms and requires the State to make payments to' as many taxpayers as are entitled to claim the tax credit in whatever amounts they are entitled to. See Ala.Code §§ 16-6D-9(a)(2), 16-6D-8(c). The AAA thus expressly imposes an obligation on the State to pay money, and therefore creates a new debt of the State within the meaning of Section 213. See Opinion of the Justices No. 88, 36 So.2d 475, 479 (Ala.1948) (finding unconstitutional legislation that would ‘bind the State ... to pay money for a period of thirty years’).
“While the State is free to create continuing financial obligations otherwise within its constitutional authority, ‘[i]n order to escape being a new debt of the State, there must be a new source of revenue provided to retire the debt.’ Opinion of the Justices No. 359, ‘692 So.2d at 827 (finding invalid legislation that appropriated proceeds of existing tax on cellular radio telecommunications to pay for new obligations). Thus, ‘[n]o part of the taxes presently paid into the general fund of the State will or can be used’ to satisfy the new obligations created by the legislation. Edmonson v. State Indus. Dev. Auth., 184 So.2d 115, 117 (Ala.1966). It is undisputed that the AAA does not contain any new source of revenue to finance the new obligations created by Section 8. Rather, it diverts funds from an existing revenue source to pay those obligations. See Ala.Code § 16-6D-8(a)(2> (‘Income tax credits authorized by this section shall be paid out of the sales tak collections made to the Education Trust Fund.’). Because the AAA imposes new financial obligations on the State without a corresponding new source of revenue to pay those obligations, it creates a new debt in violation of Section 213.”
The State defendants argue that Section 8 of the AAA does not create a “debt” as contemplated by §.213.. We agree.
Section 16-6D-8(a)(l) provides; in part: “The income tax credit shall be an amount equal to 80 percent' of the average annual state cost of attendance for a public K-12 student during the applicable tax year or the actual cost of attending a nonfailing public school or nonpublic school, whichever is less.... If income taxes owed by such a parent are less than the total credit allowed under this subsection, the taxpayer shall be entitled to a refund or rebate, as the case may be, equal to the balance of the unused credit with respect to that taxable year.”
Section 16-6D-8(c) provides, in part, that
“[t]he Commissioner of Revenue shall certify to the Comptroller the amount of income tax credits due to parents under this section and the Comptroller shall transfer into the Failing Schools Income Tax Credit Account only the amount from sales tax revenues within the Education Trust Fund that is sufficient for the Department of Revenue to use to cover the income tax credits for the applicable tax year.”
Initially, we note that any tax credits the State is obligated to refund pursuant to § 16-6D-8 will be refunded solely on the basis of an annual determination. Ala *130 bama Alcoholic Beverage Control Bd. v. City of Pelham, 855 So.2d 1070 (Ala.2003)(holding that no “debt” existed under § 213 because any amount paid by the State would be paid solely on the basis of an annual determination). To the extent that the refundable tax credits can be construed as creating a new obligation of the State, they are constitutionally permissible because they are credited by the express language of § 16-6D-8 against the current State sales-tax revenue for the applicable tax year. See Opinion of the Justices No. 88, 251 Ala. 91, 36 So.2d 475 (1948); Hall v. Blan, 227 Ala. 64, 148 So. 601 (1933). Specifically, § 16-6D-8(c) requires the revenue commissioner to certify to the State comptroller “only the amount from sales tax revenues ... that is sufficient for the Department of Revenue to use to cover the income tax credits for the applicable tax year.” Thus, the refund provision of § 16-6D-8 “‘neither makes nor contemplates an obligation of the State further than such as is “within the revenues levied and assessed, and in process of collection” for the current year or such as may have been already collected for that year. In re Opinions of Justices [No. 88 ], 251 Ala. 91, 36 So.2d 475 [ (1948)]; Brown v. Gay-Padgett, 188 Ala. 423, 66 So. 161 [ (1914) ]; In re Opinions of Justices [No. 581 238 Ala. 293, 191 So. 82 [ (1939) ].’ ” Alabama Alcoholic Beverage Control Bd., 855 So.2d at 1081 (quoting Opinion of the Justices No. 100, 252 Ala. 465, 467, 41 So.2d 761, 763 (1949)). Because any refunds due parents pursuant to § 16-6D-8 are determined on a yearly basis and paid only from that amount of sales-tax revenue necessary to cover the income-tax credits for that tax year, no new debt is created within the meaning of § 213.
Second, a debt within the meaning of § 213 does not include obligations of the State that are contingent in nature. See Opinion of the Justices No. 881, 892 So.2d 375, 378 (Ala.2004) (holding that “Section 213 of the Alabama Constitution, as amended by Amend. No. 26, is directed toward preventing.the creation of an obligation that must be paid ‘in any event ’ ” and that because the interest-rate swap agreements at issue were contingent in nature, there was no “new debt” created as that phrase is defined in § 213). Here, the refund available under § 16-6D-8(a)(l) comes into play only “if [the] income taxes owed by ... a parent are less than the total credit allowed” under § 16-6D-8(a)(1). Thus, whether a parent is entitled to a refundable tax credit is contingent upon whether that parent’s tax liability is less than the total credit allowed for that taxable year. Even the amount of the tax credit itself is contingent, because it is based upon the “average annual state cost of attendance for a public K-12 student during the applicable tax year or the actual cost of attending a nonfailing public school or nonpublic school, whichever is less.” § 16-6D-8(a)(l). Accordingly, because the tax credit provided by § 16-6D-8 is contingent in nature, there is no new debt created within the meaning of § 213.

Separation of Church and State

We now turn to the issue whether the circuit court should have addressed the plaintiffs’ constitutional challenges to the AAA on religious grounds. As previously stated, the plaintiffs did not move for a judgment on the pleadings with respect to Counts IX and X (alleging that the AAA violates § 263 and § 3, respectively, of the Alabama Constitution) of their complaint because they contended that factual development would be necessary for a resolution of those claims. Counts IX and X were therefore before the circuit court only on the State defendants’ motion to dismiss the entire complaint pursuant to Rule 12(b)(6), Ala. R. Civ. P., and the tax-credit parents’ motion for a judgment on *131 the pleadings pursuant to Rule 12(c), Ala. R. Civ. P. Because the circuit court ruled that the AAA was unconstitutional for other reasons, it did not address whether Counts IX and X of the complaint stated claims upon which relief could be granted and it denied the State defendants’ and the tax-credit parents’ motions as moot. Because this Court has now concluded that the AAA is not unconstitutional on the grounds alleged in Counts I through VIII, we will, for purposes of judicial efficiency, address whether Counts IX and X should also be dismissed, especially since resolution of these claims are inextricably intertwined with the. plaintiffs’ § 73 claims. See Lloyd Noland Found., Inc. v. City of Fairfield Healthcare Auth., 837 So.2d 253, 263 (Ala.2002) (“[A] pretrial final judgment disposing of all claims in the case (as distinguished from a Rule 54(b)[, Ala. R. Civ. P.,] summary judgment disposing of fewer than all claims) entitles [the appellant], for purposes of our review, to raise issues based upon the trial court’s adverse rulings, including the denial of its summary-judgment motions. See Ala. RApp. P. 4(a)(1).”).

Standard of Revieiv

In Nance v. Matthews, 622 So.2d 297, 299 (Ala.1993), this Court stated the following standard for reviewing a Rule 12(b)(6), Ala. R. Civ. P., motion to dismiss:
“The appropriate standard of review under Rule 12(b)(6) is whether, when the allegations of the complaint are viewed most strongly in the pleader’s favor, it appears that the pleader could prove any set of circumstances that would entitle her to relief.... In making this determination, this Court does not consider whether the plaintiff will ultimately prevail, but only whether she may possibly prevail.... We note that a Rule 12(b)(6) dismissal is proper only when it appears beyond doubt that the plaintiff can prove no set of facts in support of the claim that would entitle the plaintiff to relief.”
For the reasons discussed below, we conclude that Counts IX and X of the plaintiffs’ complaint are due to be dismissed insofar as the plaintiffs will be unable to prove any set of facts that would entitle them to relief under Rule 12(b)(6). Because of this holding, there is no need to address the tax-credit parents’ motion for a judgment on the pleadings. Cf. Pontius v. State Farm Mut. Auto. Ins. Co., 915 So.2d 557 (Ala.2005)(discussing the similarities and differences between Rule 12(b)(6) and Rule 12(c)).

Discussion

IX. Whether the AAA violates Art. XIV, § 263, of the Alabama Constitution?

Article XIV, § 263, of the Alabama Constitution of 1901 provides that “[n]o money raised for the support of the public schools shall be appropriated to or used for the support of any sectarian or denominational school.” The plaintiffs allege in Count IX of their complaint that the tax credit provided by Section 8 of the AAA, which authorizes a refundable State income-tax credit for parents who transfer their children from a failing public school to another nonfailing public or nonpublic school of the parents’ choice, violates § 263 because, they say, the tax credit diverts money from the ETF raised for the support of the public schools and appropriates that money to the support of religious schools. The plaintiffs further allege that as of August 23, 2013, 53 of the 56 nonpublic schools for which the Section 8 tax credit could be used were religious schools and that the AAA places no restrictions on the use of the funds to those religious schools. For the same reasoning previously employed in holding that nothing in the plain text of Art. IV, § 73, defines an *132 appropriation as relating to or including a tax credit, we also hold that nothing in the plain text of Art. XIV, § 263, defines an appropriation as relating to or including a tax credit. Additionally, we point out that the present jurisprudential trend by the United States Supreme Court regarding indirect government aid to pervasively sectarian schools demonstrates that an indirect-government-aid program is not subject to constitutional challenge where the program is neutral with respect to religion and the ultimate decision to confer the aid rests with a private individual as opposed to the government. The most instructive case in this sense is Zelman v. Simmons-Harris, 536 U.S. 639, 122 S.Ct. 2460, 153 L.Ed.2d 604 (2002), in which a group of Ohio taxpayers brought an action challenging the voucher portion of the Ohio Pilot Scholarship Program on the ground that the voucher portion had the primary effect of advancing religion in violation of the Establishment Clause. The Supreme Court held that the program did. not violate the Establishment Clause because the program was neutral with respect to religion and .the governmental assistance flowed to religious schools only through the private choice of the students’ parents:
“There is no dispute that the program challenged here was enacted for the valid secular purpose of providing educational assistance to poor children in a demonstrably failing public school system. Thus, the question presented is whether the Ohio program nonetheless has the forbidden ‘effect’ of advancing or inhibiting religion.
“To answér that question, our decisions have drawn a consistent distinction between government programs that provide aid directly to religious schools, Mitchell v. Helms, 530 U.S. 793, 810-814 (2000) (plurality opinion); id., at 841-844 (O’CONNOR, J., concurring in judgment); Agostini [v. Felton, 521 U.S. 203] at 225-227 [(1997)]; Rosenberger v. Rector and Visitors of Univ. of Va., 515 U.S. 819, 842 (1995) (collecting cases), and programs of true private choice, in which government aid reaches religious schools only as a result of the genuine and independent choices of private individuals, Mueller v. Allen, 463 U.S. 388 (1983); Witters v. Washington Dept. of Servs. for Blind, 474 U.S. 481 (1986); Zobrest v. Catalina Foothills School Dist., 509 U.S. 1 (1993). While our jurisprudence with respect to the constitutionality • of direct aid programs has ‘changed significantly’ over the past two decades, Agostini supra, at 236, our jurisprudence with respect to true private choice programs has remained consistent and unbroken. Three times we have confronted Establishment Clause challenges to neutral government programs. that provide aid directly to a broad class of individuals, who, in turn, direct the aid to religious schools or institutions of their own choosing. Three times we have rejected such challenges.
“In Mueller,,,we rejected an Establishment Clause challenge to a Minnesota program authorizing tax deductions for various educational expenses, including private school tuition costs, even though the great majority of the program’s beneficiaries (96%) were parents of children in religious schools. We began by focusing on the class of beneficiaries, finding that because the class included ‘all parents,’ including parents with ‘children [who] attend nonsectarian private schools or sectarian private schools,’ 463 U.S., at 397 (emphasis in original), the *133 program was ‘not readily subject to challenge under the Establishment Clause,’ id., at 399 (citing Widmar v. Vincent, 454 U.S. 263, 274 (1981)(‘The provision of benefits to so broad a spectrum of groups is an important index of secular effect’)). Then, viewing the program as a whole, we emphasized the principle of private choice, noting that public funds were made available to religious schools ‘only as a result of numerous, private choices of individual parents of school-age children.’ 463 U.S., at 399-400. This, we said, ensured that ‘no “imprimatur of state approval” can be deemed to have been conferred on any particular religion, or on religion generally.’ Id., at 399 (quoting Widmar, supra, at 274). We thus found it irrelevant to the constitutional inquiry that the vast majority of beneficiaries were parents of children in religious schools, saying:
“ We would be loath to adopt a rule grounding the constitutionality of a facially neutral law on annual reports reciting the extent to which various classes of private citizens claimed benefits under the law.’ 463 U.S., at 401.
“That the program was one of true private choice, with no evidence that the State deliberately skewed incentives toward religious schools, was sufficient for the program to survive scrutiny under the Establishment Clause.
“In Witters, we used identical reasoning to reject an Establishment Clause challenge to a vocational scholarship program that provided tuition aid to a student studying at a religious institution to become a pastor. Looking at the program as a whole, we observed that ‘[a]ny aid ... that ultimately flows to religious institutions does so only as a result of the genuinely independent and private choices of aid recipients.’ 474 U.S., at 487. We further remarked that, as in Mueller, ‘[the] program is made available generally without regard to the sectarian-nonsectarian, or publicmon-public nature of the institution benefit-ted.’ 474 U.S., at 487 (internal quotation marks omitted). In light of these factors, we held that the program was not inconsistent with the Establishment Clause. Id., at 488-489.
“Five Members of the Court, in separate opinions, emphasized the general ■rule from Mueller that the amount of government aid channeled to religious institutions by individual aid recipients was not relevant to the constitutional inquiry. 474 U.S., at 490-491 (Powell, J., joined by Burger, C.J., and REHNQUIST, J., concurring) (citing Mueller, supra, at 398-399); 474 U.S., at 493 (O’CONNOR, J., concurring in part and concurring in judgment); id., at 490 (White, J., concurring). Our holding thus rested not on whether few or many recipients chose to expend government aid at a religious school but, rather, on whether recipients generally were empowered to direct the aid to schools or institutions of their own choosing.
“Finally, in Zobrest, we applied Mueller and Witters to reject an Establishment Clause challenge to a- federal program that permitted sign-language interpreters to assist deaf children enrolled in religious schools. Reviewing our earlier decisions, we stated that ‘government programs that neutrally provide benefits to a broad class of citizens defined without reference to religion are hot readily subject to an Establishment Clause challenge.’ 509 U.S., at 8. Looking once again to the challenged program as a whole, we observed that the program ‘distributes benefits neutrally to' any child qualifying as “disabled.” ’ Id., at 10. Its ‘primary beneficiaries,’ we said, were ‘dis *134 abled children, not sectarian schools.’ Id., at 12.
“We further observed that ‘[b]y according parents freedom to select a school of their choice, the statute ensures that a government-paid interpreter will be present in a sectarian school only as a result of the private decision of individual parents.’ Id., at 10. Our focus again was on neutrality and the principle of private choice, not on the number of program beneficiaries attending religious schools. Id., at 10-11. See, e.g., Agostini, 521 U.S., at 229 (‘Zobrest did not turn on the fact that James Zobrest had, at the time of litigation, been the. only child using a publicly funded sign-language interpreter to attend a parochial school’). Because the program ensured that parents were the ones to select a religious school as the best learning environment for their handicapped child, the circuit between government and religion was broken, and the Establishment Clause was not implicated.
“Mueller, Witters, and Zobrest thus make clear that where a government aid program is neutral with respect to religion, and provides assistance directly to a broad class of citizens who, in turn, direct government aid to religious schools wholly as a result of their own genuine and independent private choice, the program is not readily subject to challenge under the Establishment Clause. A program that shares these features permits government aid to reach religious institutions only by way of the deliberate choices of numerous individual recipients. The incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits. As a plurality of this Court recently observed:
“ ‘[I]f numerous private choices, rather than the single choice of a government, determine the distribution of aid, pursuant to neutral eligibility criteria, then a government cannot, or at least cannot easily, grant special favors that might lead to a religious establishment.’ Mitchell, 530 U.S., at 810.
“See also id., at 843 (O’CONNOR, J., concurring in judgment) (‘[WJhen government aid supports a school’s religious mission only because of independent decisions made by numerous individuals to guide their secular aid to that school, “no reasonable observer is likely to draw from the facts ... an inference that the State itself is endorsing a religious practice or belief” (quoting Witters, 474 U.S., at 493 (O’CONNOR, J., concurring in part and concurring in judgment))). It is precisely for these reasons that we have never found a program of true private choice to offend the Establishment Clause.
“We believe that the program challenged here is a program of true private choice, consistent with Mueller, Witters, and Zobrest, and thus constitutional. As was true in those cases, the Ohio program is neutral in ah respects toward religion. It is part of a general and multifaceted undertaking by the State of Ohio to provide educational opportunities to the children of a failed school district. It confers educational assistance directly to a broad class of individuals defined without reference to religion, ie., any parent of a school-age child who resides in the Cleveland City School District. The program permits the participation of all schools within the district, religious or nonreligious. Adjacent pubhc schools also may participate and have a financial incentive to do so. *135 Program benefits are available to participating families on neutral terms, with no reference to religion. The only preference stated anywhere in the program is a preference for low-income families, who receive greater assistance and are given priority for admission at participating schools.”
536 ■ U.S. at 649-53. See also Locke v. Davey, 540 U.S. 712, 719, 124 S.Ct. 1307, 158 L.Ed.2d 1 (2004) (“[T]he link between government funds and religious training is broken by the independent and private choice of recipients”).
The reasoning applied in Zelman is applicable in this case. To start, the AAA as a whole has a secular purpose, insofar as it aimed at improving public education by injecting additional accountability into the education system, as well as ensuring educational opportunities for children in failing public schools. The purpose of the Section 8 tax credit is to provide financial aid or assistance in the form of a refundable State income-tax credit to parents who choose to remove their child from a failing public school to offset the expenses incurred by transferring the child. Thus, the Section 8 tax-credit provision was designed for the benefit of parents and students, and not for the benefit of religious schools. The Section 8 tax-credit provision is neutral insofar as the credit is extended to a class of parents who have children in failing public schools and is extended without reference to religion. Moreover, the parents of children in a failing public school have the freedom to transfer the students to a school of their own private choice, i.e., another nonfailing public school or nonpublie school, either religious or nonreligious. For these reasons, the AAA as a whole ensures that any aid that may ultimately flow to a religious school as a result of the tax credit will do so only as a result of the private decision of individual parents rather than flowing .directly from- the State. There is simply no evidence that the State, in authorizing the Section 8 tax credit, has deliberately skewed incentives toward religious schools. As emphasized in Zelman, “[t]he incidental advancement of a religious mission, or the perceived endorsement of a religious message, is reasonably attributable to the individual recipient, not to the government, whose role ends with the disbursement of benefits.” 536 U.S. at 652. Because the Section 8 tax-credit provision is both neutral as to religion and is based on true private choice, the provision survives scrutiny under § 263, and the plaintiffs therefore will be unable to prove any set of facts that would entitle them to relief. Rule 12(b)(6), Aa. R. Civ. P.
The plaintiffs also allege in Count IX of their complaint that the tax credit provided in Section 9 of the AAA, which authorizes a tax credit for individuals and corporations who donate to scholarship-granting organizations violates § 263 of the Alabama Constitution because, they say, the tax credit diverts money from the ETF, which supports the public schools, and appropriates and uses that money to support religious schools. Again, as previously held, the Section 9 tax credit to a parent or.a corporation under the AAA cannot be construed as an “appropriation” to a religious school; there is simply no money being set aside or specified from the public revenue, or treasury to be applied to a religious school. Toney, supra, McAlpine, supra. A good analysis involving similar facts can be gathered from Arizona Christian School Tuition Organization v. Winn, supra, a case in which a group of taxpayers challenged an Arizona statute that provided dollar-for-dollar tax credits for private contributions to Student Tuition Organizations (“STOs”), which, in turn, distributed the scholarships to stu *136 dents attending private schools, many of which were religious. The taxpayers alleged that the Arizona statute violated the Establishment Clause because the statute “allow[ed] STOs ‘to use State income-tax revenues to pay tuition for students at religious schools,’ some of which ‘discriminate on the basis of religion in selecting students.’ ” 563 U.S. at-, 131 S.Ct, at 1441. The taxpayers viewed the tax credit as a government expenditure. In reaching the threshold decision that the taxpayers lacked standing to pursue their action, the United States Supreme Court incorporated into its reasoning the following analysis and distinction between governmental expenditures and tax credits:
“The distinction between governmental expenditures and tax credits refutes respondents’ assertion of standing. When Arizona taxpayers choose to contribute to STOs, they spend their own money, not money the State has collected from respondents or from other taxpayers. Arizona’s § 43-1089 does not ‘extrac[t] and spen[d]’ a conscientious dissenter’s funds in service of an establishment, Flast [v. Cohen], 392 U.S. [83], at 106, 88 S.Ct. 1942 [ (1968) ], or ‘ “force a citizen to contribute three pence only of his property” ’ to a 'sectarian organization, id., at 103, 88 S.Ct. 1942 (quoting 2 Writings of James Madison, supra, at 186 [ (G. Hunt ed.1901) ]). On the contrary, -respondents- and other Arizona 'taxpayers remain free to pay their own tax bills, without contributing to an STO. Respondents are likewise able to contribute to an STO of their choice, either religious or secular. And respondents also have the.option of contributing to other charitable organizations, in which case respondents may become ■ eligible for a tax deduction or a different tax credit....
“. When the government collects and spends taxpayer money, governmental choices, are responsible for the transfer of wealth.... Here, by contrast, contributions result from the decisions of private taxpayers ‘regarding their own funds. Private citizens create private STOs; STOs choose beneficiary schools; and taxpayers then contribute to STOs. While the State, at the Outset, affords the opportunity to create and contribute to an STO, the tax credit system is implemented by private action and with no state intervention....
“... Like contributions that lead to charitable tax deductions', contributions yielding STO tax credits are not owed to the State and, in fact, pass directly from taxpayers to private organizations. Respondents’ contrary position assumes that income should be treated as if it were government property even if it has not come into the tax collector’s hands. That premise finds no basis in standing jurisprudence. Private bank accounts cannot be equated with the Arizona State Treasury.”
Arizona Christian, 563 U.S. at -, 131 S.Ct. at 1447-48.
Likewise in this case, a tax credit cannot be equated to a government expenditure. . When Alabama taxpayers and corporations contribute to scholarship-granting organizations, they do so by virtue of their own private -funds, not funds that the State has collected from other taxpayers. As noted in Arizona Christian,, “contributions yielding-[scholarship-granting organization] tax credits are not owed to the State and, in fact, pass directly from-taxpayers to private organizátions.” 563 U.S. at --, 131 S.Ct. at 1448. “While the State, at the outset, affords the opportunity to create and contribute to [a scholarship-granting organization], the tax credit system is implemented by private action and with no state intervention.” 563 U.S. at-, 131 S.Ct. at 1448. Moreover, the Section 9 *137 tax-credit provision in this case offers genuine and independent choices to taxpayers and corporations insofar as they are free to contribute to scholarship-granting organizations of their own private choice. Because we hold that the Section 9 tax credit also survives scrutiny under § 263, the plaintiffs will be unable to prove any set of facts that would entitle them to relief. Accordingly, Count IX of the plaintiffs’ complaint is due to be dismissed. Rule 12(b)(6), Ala. R. Civ. P.

X. Whether the AAA violates Art. I, § 3, of the Alabama Constitution?

Article I, § '3, of the Alabama Constitution of 1901 provides:
“That no religion shall be established by law; that no preference shall be given by law to any religious sect, society, denomination, or mode of worship; that no one shall be compelled by law to attend any place of worship; nor to pay any tithes, taxes, or other rate for building or repairing any place of worship, or for maintaining any minister or ministry; that no religious test shall be required as a qualification to any office or public trust under this state; and that the civil rights, privileges, and capacities of any citizen shall not be in any manner affected by his religious, principles.”
(Emphasis added.)
The plaintiffs allege in Count X of their complaint that the Section 8 and Section 9 tax-credit provisions of the AAA 'violate Article § 3 of the Alabama Constitution because, they say, taxpayer funds are diverted to religious schools through tax credits and taxpayers are therefore compelled, through their tax payments, to pay for the building and repair of places of worship and for maintaining ministers and ministries. This argument is basically a rehash of the previous arguments that both tax-credit provisions are violative of §§ 73 and 263 of the Alabama Constitution. Our previous holdings that the tax-credit provisions of the AAA pass constitutional scrutiny under §§ 73 and 263 compel the same conclusion with respect to the plaintiffs’ § 3 claim with the necessity of little, if any, additional analysis.
Section 3 of the Alabama Consti-. tution is the counterpart of the religion clauses of the First Amendment to the United States Constitution. It is well set-. tied that the Establishment Clause prevents a State from enacting laws that have the purpose or effect of advancing or inhibiting religion. In Locke, supra, the Supreme Court stated:
“The Religion Clauses of the First' Amendment provide: ‘Congress shall make no law respecting an establish-' ment of religion, or prohibiting the free exercise thereof.’ These two Clauses, the Establishment Clause and the Free Exercise Clause, are frequently in tension. See Norwood v. Harrison, 413 U.S. 455, 469 (1973) (citing Tilton v. Richardson, 403 U.S. 672, 677 (1971)). Yet we have long said that ‘there is room for play in the joints’ between them. Walz v. Tax Comm’n of City of New York, 397 U.S. 664, 669 (1970). In other words, there are some state actions permitted by the Establishment Clause but not required by the Free Exercise Clause.
“This case involves that ‘play in the joints’ described above. Under .our Establishment Clause precedent, the link between government funds and religious training is broken by the independent und private choice of recipients. See Zelman v. Simmons-Harris, 536 U.S.-639, 652 (2002); Zobrest v. Catalina Foothills School Dist., 509 U.S. 1, 13-14 (1993); Witters v. Washington Dept. of *138 Servs. for Blind, 474 U.S. 481, 487 (1986); Mueller v. Allen, 463 U.S. 388, 399-400 (1983).”
540 U.S. at 718-19 (emphasis added).
As can be gleaned from Zelman, supra, and the cases cited therein, most of the First Amendment Establishment Clause cases that have reached the Supreme Court have involved state laws authorizing financial benefits to church-related institutions, and those cases, including Zelman, have consistently held that indirect-governmental-aid programs to religious schools do not violate the Establishment Clause where the programs are neutral with respect to religion and the decision to confer the aid rests with a private individual, as opposed to the government. In applying the principles of Zelman, we concluded that the tax-credit provisions of the AAA passed constitutional scrutiny under § 263 because the provisions were neutral insofar as they did not have the primary effect of advancing religion, and any moneys that may ultimately flow to a religious school as a result of those provisions will do so only as a result of the independent and private choice of students’ parents, as opposed to the State. In other words, the State’s interest in authorizing the tax credits in this, case was not building or repairing places of worship or maintaining ministers and ministries. In Alabama Education Ass’n v. James, supra, it was held that the “Alabama constitutional provisions concerning the establishment of religion are not more restrictive than the Federal Establishment of Religion Clause in the First Amendment to the United States Constitution.” 373 So.2d at 1081. Consequently, the tax-credit provisions of the AAA do not violate Art. I, § 3, of the Alabama Constitution, the Alabama counterpart of the religion clauses of the First Amendment to the United States Constitution. Accordingly, Count X of the plaintiffs’ complaint is also due to be dismissed for failure to state a claim upon which relief can be granted. Rule 12(b)(6), Ala. R. Civ. P.

Intervention

The last issue we address is the scholarship parents’ postjudgment motion to intervene filed pursuant to Rule 24(a)(2) and Rule 24(b), Ala. R. Civ. P.

Standard of Review

The denial of a motion to intervene as of right is an appealable order. State v. Estate of Yarbrough, 156 So.3d 947 (Ala.2014). Generally, a ruling on a motion to intervene is within the sound discretion of the trial court and will not be disturbed on appeal absent an abuse of that discretion. Id. Likewise, the denial of a motion for permissive intervention is an appealable order. Universal Underwriters Ins. Co. v. Anglen, 630 So.2d 441 (Ala.1993). A motion for permissive intervention is committed to the broad discretion of the trial court and is therefore reviewed by this Court for abuse of that discretion. QBE Ins. Corp. v. Austin Co., 23 So.3d 1127, 1131 (Ala.2009).

XI. Whether the circuit court exceeded its discretion in denying the scholarship parents’motion to intervene?

The scholarship parents argue that the circuit court, erred in denying their post-judgment motion to intervene, which they filed on May 30, 2014. They sought to intervene both as a matter of right pursuant to Rule 24(a)(2), Ala. R. Civ. P., and, in the alternative, as permissive intervenors pursuant to Rule 24(b). In affidavits attached to their motion, Rachell Prince stated that her two children had been assigned to attend a school listed as failing under the guidelines of the AAA. She said that she enrolled her children at a private school in the fall of 2013 and applied for *139 scholarships from a scholarship-granting organization based of her income eligibility. She received notice in February 2014 that her children had been approved for scholarships totaling approximately $13,800 to offset the approximate tuition of $22,000 to attend the private school. Tyrone Whitehead’s child was zoned for a failing school, and he enrolled his child in a private school and applied for a scholarship with one of the approved scholarship-granting organizations under the AAA. Whitehead was notified in January 2014 that his child had been approved for a scholarship' and that the scholarship covered approximately $10,000 of the $11,000 in tuition at the private school. Dalphine Wilson stated that she did not like the disruptive atmosphere of the school her children were zoned to attend. She did not testify that her children were zoned for a faffing school, although this is no longer a requirement of the AAA. She enrolled her children in a Catholic school in the fall of 2013 and applied for scholarships based on her income level. In February 2014, she was notified that her children had been approved for scholarships that offset approximately' $9,000 of the approximate $11,000 in tuition due for both children. Wilson stated that she was not Catholic and that she did not choose the school for religious grounds.
Rule 24(a) provides:
“Upon timely application, anyone shall be permitted to intervene in an action: (1) when a statute confers an unconditional right to intervene; or (2) when the applicant claims an interest relating to the property or transaction which is the subject of the action and the applicant is so situated that the disposition of the action may as a practical matter impair or impede the applicant’s ability to protect that interest, unless the applicant’s interest is adequately represented by existing parties.”
As noted above, the standard of review applicable in cases involving a denial of a motion to intervene as of right is whether the trial court has acted outside its discretion. City of Dora v. Beavers, 692 So.2d 808, 810 (Ala.1997). Typically, persons desiring to intervene in a civil action as of right will claim entitlement to intervention under Rule 24(a)(2), Ala. R. Civ. P., which mandates intervention upon timely application if “the applicant claims an interest relating to the property or transaction which is the subject of the action” and is “so situated that the disposition of the action may as a practical matter impair or impede the applicant’s ability to protect that interest, unless the applicant’s interest is adequately represented by existing parties.” Thus, this Court has held that, under Rule 24(a)(2), the trial court has discretion to determine “whether the potential intervenor has demonstrated: (1) that its motion is timely; (2) that it has a sufficient interest relating to the property or transaction; (3) that its ability to protect its interest may, as a practical matter be impaired or impeded; and (4) that its interest is not adequately represented.” City of Dora, 692 So.2d at 810. Intervention as of right under Rule 24(a) is proper only if all four requirements have been established.
Rule 24(b), Aa. R. Civ. P., provides that on a timely motion the court may permit anyone to intervene when a statute confers a conditional right to intervene or when an applicant’s claim or defense and the main action share a common question of law or fact. Rule 24(b) goes on to provide that “[i]n exercising its discretion the court shall consider whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.”
In discussing the timeliness of motions to intervene, this Court has stated:
*140 “ ‘Since [Rule 24, Ala. R. Civ. P.], itself, is silent concerning what constitutes a “timely application,” it has long been held that the determination of timeliness -is a matter committed to the sound discretion of the trial court. See Strousse v. Strousse, 56 Ala.App. 436; 322 So.2d 726 (1975). See also McDonald v. E.J. Lavino Co., 430 F.2d 1065, 1072 (5th Cir.1970). Because the pressure to allow intervention “of right” under Rule 24(a) is by its very nature more compelling than is permissive intervention, most courts tend to require less rigidity in evaluation of timeliness' under Rule 24(a). See Diaz v. Southern Drilling Corp., 427 F.2d 1118 (5th Cir.) cert. denied, 400 U.S. 878, 91 S.Ct. 118, 27 L.Ed.2d 115 (1970), rehearing denied, 400 U.S. 1025,. 91 S.Ct. 580, 27 L.Ed.2d 638 (1971). See generally, [Charles Alan. Wright et al., Federal Practice & Procedure] § 1916 [(2d ed.1986)]. As expressed in McDonald, 430 F.2d at 1073: “Since in situations where intervention is as of right, the would-be intervenor may be seriously harmed if he is not' permitted to intervene, courts should be reluctant to dismiss such a request for intervention as untimely, even though they might deny the request if the intervention were merely permissive.” ’
“Randolph County v. Thompson, 502 So.2d 357, 364 (Ala.1987). In other words, trial courts have broader discretion in denying a motion for permissive intervention .as untimely under Rule 24(b) than they do in denying as untimely a motion to intervene, as of right under Rule 24(a).” . ,
QBE Ins. Corp. v. Austin Co., 23 So.3d at 1131.
Generally, postjudgment motions to intervene are disfavored. Duncan v. First Nat’l Bank of Jasper, 573 So.2d 270, 275 (Ala.1990). The rationale behind this general principle is the assumption that allowing intervention after a judgment has been entered will prejudice the rights of the existing parties or substantially interfere with the orderly processes of the court.
With regard to the scholarship parents’ motion to intervene as a matter of right, they are .seeking to intervene to uphold the constitutionality of the AAA, arguing that they will not be able to keep their children enrolled in private schools if the AAA is declared unconstitutional. We cannot say that the scholarship parents’ interests are not being adequately represented in this case. The United States Supreme Court, in interpreting Rule 24, Fed.R.Civ.P., provided two central principles for an adequacy-of-representation analysis.[13] Trbovich v. United Mine Workers of America, 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972). First, the Supreme Court stated that, while a- proposed intervenor bears the burden of proof, it is sufficient to prove that representation “ ‘may be’ inadequate” — an inter-venor does not have to prove that representation ■ will in fact be inadequate. 404 U.S. at 538 n. 10. Second, the Supreme Court established that the burden of showing that representation may be inadequate “should be treated as minimal.” Id. “However ‘minimal’ this burden may be, it cannot be treated as so minimal as to write the requirement completely out of the *141 rule.” Bush v. Viterna, 740 F.2d 350, 355 (5th Cir.1984).
“There is a presumption of adequate representation when an existing party-seeks the same objectives as the.interveners. Clark v. Putnam County, 168 F.3d 458, 461 (11th Cir.1999). This presumption is weak and can be overcome if the plaintiffs present some evidence to the contrary. Id., If the interveners overcome this presumption, the court ‘returns to the general rule that adequate representation exists “[1] if no collusion is shown between the represen-tativé and an opposing party, [2] if the representative does not have or represent an interest adverse to the proposed intervener, and [3] if the representative does not fail in fulfillment of his duty.” ’ Id. Interveners need only show that the current' plaintiffs representation ‘may be inadequate,’ however, and the burden for making such a showing is ‘minimal.’ Id.”
Stone v. First Union Corp., 371 F.3d 1305, 1311 (11th Cir.2004); see also United States v. City of Miami, 278 F.3d 1174, 1178-79 (11th Cir.2002)(finding that the United States of America’s interest in bringing the employment-discrimination suit against, the city was identical to a police officers’ association); Athens Lumber Co. v. FEC, 690 F.2d 1364, 1367 (11th Cir.l982)(denying intervention because both the machinists’ union and the Federal Election Commission “have precisely the same objective” in upholding the constitutionality of a provision of the Federal Elections Campaign Act).
The State defendants have argued' for the constitutionality of the AAA, including making arguments that the scholarship program set out in Section 9 is constitutional. Additionally, the scholarship parents’ own counsel have filed briefs and argued the constitutionality of the AAA on behalf of the tax-credit- parents. The scholarship parents argue that they have a separate interést from that of the tax-credit parents in that they are relying on scholarships instead of tax credits to send their children to private school. However, the scholarship parents stated in their postjudgment motion to intervene that they would not- be presenting any new claims or légal defenses. As indicated earlier, failure to meet one of the requirements of intervention as of right is fatal to the motion to intervene. We also question the timeliness of the scholarship parents’ motion, where the motion was filed at least three months after they knew they had received scholarships and there' is absolutely no indication that they were unaware of the litigation challenging the constitutionality of the AAA. There may also be a question as to whether the scholarship parents have shown that their rights will be impaired based on the information before the circuit court.' The scholarship parents sought intervention to argue for the constitutionality of the AAA so that their children can remain in private schools for the 2014-2015 school year and beyond. The scholarship parents make no argument that they will have to refund the scholarship money they received for the 2013-2014 school year. Furthermore, the scholarship parents did not address the applicable scholarship-granting organization’s requirements for reapplying for scholarships, e.g., how income status is confirmed from year to. year, or whether there are enough funds to pay for scholarships, from year to year, or whether any subjectivity is involved. Accordingly, we cannot say the circuit court exceeded its discretion in denying the scholarship parents’ motion to intervene as of right.
With regard to permissive intervention, we cannot say the circuit court exceeded its broad discretion in denying *142 the scholarship parents’ postjudgment motion. Again, we - question whether their motion was timely filed. Additionally, the scholarship parents are making the same claims as the State defendants and the tax-credit parents, who are adequately representing the scholarship parents’ interests. This diminishes their argument for permissive intervention. See City of Stilwell v. Ozarks Rural Elec. Coop. Corp., 79 F.3d 1038, 1043 (10th Cir.1996)(affirming the district court’s denial of intervention under Rule 24(b), Fed.R.Civ.P., when district court found that potential intervenor’s interests were adequately protected); Perry v. Schwarzenegger, 630 F.3d 898, 906 (9th Cir.2011)(affirming district court’s denial of intervention under Rule 24(b), Fed. R.Civ.P., when the court, in part, “based this conclusion first on the fact that Mov-ants had explained that they had no new evidence or arguments to introduce into the case”); and Hoots v. Pennsylvania, 672 F.2d 1133 (3d Cir.1982) (holding that although intervention as of right does not automatically mandate denial of permissive intervention, where the interests of the applicant for permissive intervention, in every manner, match those of an existing party and the party’s representation is deemed adequate, the district court is well within its discretion in deciding that the applicant’s contributions to the proceedings would be superfluous).
Based on the foregoing, we cannot say that the circuit court exceeded its discretion in denying the scholarship parents’ motion to intervene.

Conclusion

The plaintiffs challenged the constitu- ■ tionality of the AAA on several grounds. Following the enactment of the AAA on February 28, 2013, no subsequent act of the legislature rendered any of the plaintiffs’ procedural challenges moot. The plaintiffs’ procedural challenges to the AAA did not fall into the realm of nonjus-ticiable political questions implicating separation-of-powers concerns. Instead, the plaintiffs’ allegations of procedural infirmities in the enactment process of the AAA did not implicate a lack of respect due the legislative branch of government, but acknowledged the constitutional responsibility of this Court as the final arbiter of State constitutional disputes. In addressing the merits of the plaintiffs’ constitutional challenges, we hold as follows: (1) that the AAA did not violate the original-purpose requirement of the Alabama Constitution because the substitute bill did not change the general purpose of the HB 84, the original bill; (2) that the AAA did not violate the three-readings requirement of the Alabama Constitution because the substitute bill was germane to and not inconsistent with the general purpose of the original bill so that the substitute bill did not have to be read three times on three different days; (3) that the AAA did not violate the single-subject requirements of the Alabama Constitution simply because the legislature embraced education reform and accountability through making school-flexibility contracts available to underachieving schools and providing tax credits for parents whose children attend failing schools and the AAA did not violate the single-subject requirements by including the tax-credit programs because the tax-credit programs do not involve an appropriation; (4) that the AAA did not violate the prohibition against appropriating money to non-State charitable or educational institutions because “appropriations” are directly related to moneys in the State treasury because it is those public funds that would ultimately satisfy the particular appropriation, whereas the tax-credit programs did not involve moneys that are ever collected by the State or available to the legislature for appropriation; (5) that the AAA also did not violate the prohibí *143 tion against appropriating money to non-State charitable or educational institutions because the refundable tax credits in Section 8 of the AAA are made to the parents of students transferring from a failing school and are not paid to a non-State charitable or educational institution, and, likewise, Section 9 of the AAA does not involve a payment to a non-State charitable or educational institution because the taxpayer receives a tax credit for donations to a scholarship-granting organization; (6) that the AAA does not violate the constitutional requirement that all net proceeds from the State income tax be used for the payment of public-school-teacher salaries because the Section 9 tax-credit program is a tax credit and therefore does not involve funds that actually enter the State treasury; (7) that the AAA does not violate the constitutional prohibition against creating new debt because the tax credits are determined on a yearly basis and paid only from that amount of sales-tax revenue necessary to cover the income-tax credits for that tax year; (8) that the AAA does not violate the constitutional prohibition against appropriating money raised for public schools to the support of religious schools because the AAA does not involve appropriations and because the AAA is neutral with respect to religion, and any governmental assistance to religious schools will flow only through the private choice of the students’ parents; (9) that the AAA does not violate the constitutional prohibition against the State’s advancing religion because the AAA is neutral with respect to religion and any perceived or incidental advancement of religion is from the private choices of individual parents about their children’s education; and (10) that the circuit court did not exceed its discretion in denying the scholarship parents’ post-judgment motion to intervene because, among other things, they were adequately represented by the existing parties.
Based on the foregoing, the judgment of the circuit court is affirmed in part and reversed in part and the case is remanded for proceedings consistent with this opinion. The order denying the scholarship parents’ motion to intervene is affirmed.
1130987 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MOORE, C.J., and STUART, PARKER, MAIN, and WISE, JJ., concur.
SHAW and BRYAN, JJ., concur in part and concur in the result.
MURDOCK, J., dissents.
1131020 — AFFIRMED.
MOORE, C.J., and STUART, PARKER, MURDOCK, SHAW, MAIN, WISE, and BRYAN, JJ., concur.
1131021 — AFFIRMED IN PART; REVERSED IN PART; AND REMANDED.
MOORE, C.J., and STUART, PARKER, MAIN, and WISE, JJ., concur.
SHAW and BRYAN, JJ., concur in part and concur in the result. .
MURDOCK, J., dissents.

. Revenues credited to the ETF are used for the support, maintenance, and development of public education in Alabama, debt service and capital improvements relating to educational facilities, and other functions related to educating the State’s citizens. See, e.g., Act No. 2014-456, Ala. Acts 2014. Programs and agencies supported by the ETF include K-12 education, public-library services, performing and fine arts, various scholarship programs, the State's education regulatory departments, and two- and four-year colleges and universities. Id. The revenues from multiple sources are allocated to the ETF, the largest of which are the individual and corporate income tax, sales tax, utility tax, and use tax. See Ala.Code 1975, § 40-18-58, § 40-23-85, § 40-23-108, and§ 40-21-123.

. Daniel Boyd is the superintendent of the Lowndes County Public School System, Anita Gibson is a public-school teacher and president of the Alabama Education Association, and Senator Quinton Ross represents the 26th District in the Alabama Senate.

. The Code commissioner is also the director of the Legislative Reference Service of Alabama.

. A “pocket veto” is a veto that occurs when the governor leaves a bill unsigned at the end of a legislative session, denying the legislature the opportunity for a potential override vote.

. " ‘ “Obiter dictum is a an expression of opinion by the court or judge on a collateral question not directly involved, or mere argument or illustration originating with him, while judicial dictum is an expression of opinion on a question directly involved, argued by counsel, and deliberately passed on by the court, though not necessary to a decision. While neither is binding as a decision, judicial dictum is entitled to much • greater weight than the other, and should not be lightly disregarded.” ’ "
Ex parte M.D.C., 39 So.3d 1117, 1141 (Ala.2009) (Murdock, J., dissenting) (quoting Stark v. Watson, 359 P.2d 191, 196 (Okla.1961), quoting in turn Crescent Ring Co. v. Travelers’ Indent. Co., 102 N.J.L. 85, 132 A. 106, 107 (1926)).

.The State defendants exclude from their political-question argument the plaintiffs’ procedural claims set out in Counts IV and V.

. With regard to the constitutionality of the AAA, the tax-credit parents incorporate by reference several of the State defendants' arguments. They also raise essentially the same arguments regarding the constitutionality of the AAA as the State defendants have regarding their remaining arguments. We have considered the tax-credit parents' fine briefs. For ease of discussion, we will continue to refer to the State defendants in addressing all the arguments responding to the plaintiffs’ constitutional challenges to the AAA.

. Section 45 excepts general appropriation bills from its single-subject requirement. Section 71 limits the appropriations that can be made in a general appropriation bill to *116 the ordinary expenses of government Chief Justice .Torbert theorized why general appropriations bills were exempt from the single-subject requirement: "It probably became evident that there was an advantage in allowing moré than one subject to be included in a single bill where that bill provided for the ordinary expenses of state government. It is impractical and too time-consuming to fund every agency in a separate bill.” Childree v. Hubbert, 524 So.2d 336, 343 (Ala.1988)(Tor-bert, C.J., concurring in part and dissenting in part). In Opinion of the Justices No. 323, 512 So.2d 72 (Ala.1987), the Court explained how public schools went from being funded in a general appropriations bill to being funded through a separate education appropriation bill and subject to the single-subject requirements of §§ 45 and 71.

. "Thus, if a parent takes advantage of the AAA by transferring his or her child to a [nonfailing public school or a] nonpublic school and receives the tax credit, the child’s failing school retains the remaining twenty percent of state funds ‘for as long the parent receives the tax credit,’ even though the failing school no longer bears the expense of educating the child who transferred.” C.M. ex rel. Marshall v. Bentley, 13 F.Supp.3d 1188, 1194 (M.D.Ala.2014).

. The AAA was not approved by a two-thirds vote of all members elected to each house.

. The act was funded through a separate appropriations act.

. “Every employer required to deduct and withhold tax under Section 40-18-71 shall for each quarterly period ... file a return and pay to the Department of Revenue the tax required to be withheld.” § 40-18-74(a), Ala. Code 1975.

. "Cases interpreting the Federal Rules of Civil Procedure can be persuasive authority in construing the Alabama Rules of Civil Procedure because of the similarities between the Alabama rules and federal rules.” Pontius v. State Farm Mut. Auto. Ins. Co., 915 So.2d 557, 561 n. 3 (Ala.2005).